991 F.2d 1039
 TOWN OF WEST HARTFORD, Summit Women's Center West,
Incorporated, Plaintiffs-Appellees,
v.
OPERATION RESCUE, Project Life, Inc., Connecticut Pro-Life
Action Network, John Kladde, Eileen M. Haggerty, William P.
Cotter, Faithful and True Roman Catholics, John Doe, Jane
Doe, Massachusetts Pro-Life Action Network, Bi-State
Operation Rescue Network, John Henshaw, Thomas J. Herlihy,
Lawrence Dolan, Defendants,
Joseph M. Scheidler, Randall A. Terry, John Charles Grant,
Jean Pollock, Catherine A. Jersey, Lillian A. Loughlin,
William Calvin, Hjalmar Syversen, Robert E. Cooley, Jayne C.
Tuller, Dolores M. Teleski, Defendants-Appellants.
 No. 321, Docket 92-7595.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 19, 1992.
Decided April 21, 1993.
 
 Jon L. Schoenhorn, Hartford, CT (Schoenhorn & Freeman, Pamela R. Hershinson, West Hartford, CT, on the brief), for plaintiff-appellee Summit Women's Center West, Inc.
 Vincent P. McCarthy, New Milford, CT (Representing all defendants-appellants except John Kladde).
 Joseph P. Secola, New Milford, CT (The Rutherford Institute of Connecticut, Inc. on the brief), (Representing all defendants-appellants except Randall Terry).
 Anthony F. Slez, Jr., Westport, CT (Slez and Slez, on the brief), for amici curiae, Nat. Organization for Women, Connecticut, Nat. Lawyers' Guild, Connecticut Civil Liberties Union, Nat. Abortion Federation, Planned Parenthood Federation of America, Inc., Nat. Abortion Rights Action League, Connecticut Affiliate.
 Before: KEARSE and MINER, Circuit Judges, POLLAK,* District Judge.
 POLLAK, District Judge:
 This case is an appeal from a permanent injunction designed to prevent interference by anti-abortion protesters with access to a women's medical facility patronized by women seeking abortions and related medical services.
 The events giving rise to this case were massive anti-abortion demonstrations that took place in West Hartford, Connecticut, on April 1, 1989, and June 17, 1989. The demonstrations appear to have been the handiwork of persons associated with Operation Rescue, an anti-abortion organization whose activities have been the focus of a substantial corpus of litigation in the federal courts. See, e.g., Bray v. Alexandria Women's Health Clinic, --- U.S. ----, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); Lucero v. Operation Rescue of Birmingham, 954 F.2d 624 (11th Cir.1992); Volunteer Medical Clinic, Inc. v. Operation Rescue, 948 F.2d 218 (6th Cir.1991); New York State NOW v. Terry, 886 F.2d 1339 (2d Cir.1989), cert. denied, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); NOW v. Operation Rescue, 726 F.Supp. 300 (D.D.C.1989); Roe v. Operation Rescue, 710 F.Supp. 577 (E.D.Pa.1989), aff'd, 919 F.2d 857 (3d Cir.1990). The two West Hartford demonstrations were aimed at Summit Women's Center West ("Center"), a medical facility providing a spectrum of women's services, including abortions. On each occasion, there was mass picketing outside the building in which the Center's offices are located. And on each occasion "rescuers" forced their way into the Center's offices and occupied the premises throughout the business day. On April 1, 1989, the picketing and occupation impeded the Center's scheduled abortions. On June 17, 1989, the Center was prevented from performing any of the scheduled abortions. On both days the demonstrators' unruly conduct required the intervention of approximately forty West Hartford police officers of the Town of West Hartford ("Town")--a third of the town force. On both days, many demonstrators were arrested.
 On June 29, 1989, less than two weeks after the second demonstration, the Town brought suit in the United States District Court for the District of Connecticut against Operation Rescue and several individuals allegedly involved in the demonstrations. The federal claims relied on were that (1) defendants' conduct was Hobbs Act "extortion," 18 U.S.C. § 1951(a), directed both at the Town and at the Center--a pattern of criminal offenses which were predicate acts for purposes of RICO, 18 U.S.C. §§ 1962 et seq.; and (2) defendants' conduct constituted a conspiracy to deprive persons of their constitutional rights, in contravention of section 1985(3) of Title 42, the so-called Ku Klux Klan Act.[1] In addition, the Town alleged certain pendent state claims, including a claim of public nuisance. Under both the federal and state claims, the complaint sought injunctive and declaratory relief as well as damages.
 In late July of 1989--approximately four weeks after the filing of the Town's complaint--the district court conducted a three-day evidentiary hearing on the Town's motion for a preliminary injunction. Subsequent to the hearing, the Town withdrew the civil rights conspiracy claim under § 1985(3).
 On September 21, 1989, the district court ruled on the Town's motion for a preliminary injunction. See Town of West Hartford v. Operation Rescue, 726 F.Supp. 371 (D.Conn.1989) rev'd, 915 F.2d 92 (2d Cir.1990). In discussing its authority to entertain the Town's RICO claim and pendent state claims, the district court noted that the Town's withdrawal of its § 1985(3) claim "leaves the RICO claim as [the] sole basis for federal jurisdiction over this action." Id. at 376.
 In detailed findings of fact the district court outlined the obstructive and invasive conduct shown to have been engaged in, on April 1 and June 17, 1989, by Operation Rescue and several (but not all) of the named individual defendants. In its conclusions of law, the district court held that the Town could not prevail on the injunctive aspect of its RICO cause of action for the reason that the RICO statute does not contemplate the issuance of injunctions in favor of plaintiffs other than the United States. 18 U.S.C. § 1964(c). The district court then went on to consider the pendent causes of action arising under Connecticut law. Concluding that the Town had established a probability of success with respect to its public nuisance claim, the district court entered a preliminary injunction prohibiting Operation Rescue and eight of the individual defendants from entering the Center or obstructing access thereto.
 On appeal, this court, on December 26, 1990, vacated the preliminary injunction. See Town of West Hartford v. Operation Rescue, 915 F.2d 92 (2d Cir.1990). This court ruled that the Town's RICO allegations did not present even a colorable claim of Hobbs Act "extortion" of the Town, 18 U.S.C. § 1951(b), or of RICO injury to the "business or property" of the Town, 18 U.S.C. § 1964(c). Hence, this court held that the district court lacked subject-matter jurisdiction of the Town's RICO cause of action.[2] This court further held that, in the absence of subject-matter jurisdiction over the single federal claim presented by the Town, the district court lacked authority to address the Town's pendent state law claims. Accordingly, this court vacated the preliminary injunction entered by the district court and remanded the case with directions to dismiss the Town's complaint. See 915 F.2d at 104-05. However, this court noted that, subsequent to the entry of the preliminary injunction, the district court had granted a motion filed by the Center to intervene as a party plaintiff. This court therefore anticipated that the order remanding the case might not terminate the litigation: "We have not considered the sufficiency of the Center's claims, and the district court may in its discretion do so, consistent with this opinion, on remand." Id. at 105.
 While the appeal from the September 21, 1989 preliminary injunction was pending in this court, there had been further activity in the district court. Subsequent to the Center's intervention as a plaintiff, the Town and the Center, on December 7, 1989, filed a second amended complaint. Named as defendants were Operation Rescue and several of the original individual defendants. Other organizations and individuals were added as defendants, and certain original individual defendants were dropped. The Town's federal cause of action remained its RICO claim; pendent to it were Connecticut law claims of public nuisance and of negligence; certain other pendent Connecticut law claims appearing in the original complaint were dropped. The Center's portion of the second amended complaint invoked federal jurisdiction both under RICO and under § 1985(3). The Center's RICO claim, focusing on "extortion," substantially paralleled the Town's RICO claim. The Center's § 1985(3) claim alleged a conspiracy to deny "women seeking abortions and other family planning services at facilities the equal protection of the laws and the equal privileges and immunities under the law and obstructing travel"; the defendants were alleged "to be motivated by an invidiously discriminatory animus directed at the class of women seeking to exercise their constitutional and legal right to choose abortions and other family planning services...." The Center's pleading also alleged pendent Connecticut law claims of nuisance,[3] trespass, tortious interference with business, and negligence. The plaintiffs sought injunctive relief and damages.
 On October 12, 1990, the Center moved for a preliminary injunction. On October 31, 1990, the Town also moved for a preliminary injunction. On the same day, the district court held a hearing on the motions for a preliminary injunction; the parties agreed that the evidence taken in July of 1989, in connection with the Town's original motion for a preliminary injunction, could be treated as before the court for purposes of the new preliminary injunction motions.
 On July 22, 1991, the district court entered orders (1) dismissing the Town's claims pursuant to this court's directive of December 26, 1990 (915 F.2d at 104-05), and (2) granting the Center's motion for a preliminary injunction. In the portion of the district court's accompanying opinion that discussed the appropriateness of injunctive relief, the district court stated its finding "that Summit is likely to prevail on at least its claim of trespass, see Whitman Hotel Corp. v. Elliott & Watrous Engineering Co., 137 Conn. 562, 570, 79 A.2d 591 (1951); More v. Urbano, 151 Conn. 381, 383, 198 A.2d 211 (1964), if not also its claim of conspiracy to violate the civil rights of the clientele who have a constitutional right to receive an abortion if they wish, id.; 42 U.S.C. § 1985(3), from which springs Summit's right to provide the service to those who wish it."
 An appeal was taken from the new preliminary injunction. While that appeal--Docket No. 91-7801--was pending, the district court addressed cross-motions for summary judgment. On May 12, 1992, the district court, in a detailed opinion, ruled on the motions. See Town of West Hartford v. Operation Rescue, 792 F.Supp. 161 (D.Conn.1992). The district court (1) granted summary judgment in the defendants' favor on the Center's RICO claim[4] and its Connecticut law claim of trespass;[5] and (2) granted summary judgment in the Center's favor on its § 1985(3) claim and its Connecticut law claim of tortious interference with business.[6] Since the district court determined that "the ability of plaintiff to continue to render services to women is compromised by defendants' conduct, particularly in view of the fact that defendants, when asked, have uniformly refused to disavow repetition of the activities of April 1, 1989 and June 17, 1989," and since "money damages will not safeguard women's access to the Center's services," the district court translated its July 22, 1991 preliminary injunction into a permanent injunction.[7] 792 F.Supp. at 169-70. Of those permanently enjoined--Operation Rescue, four other organizations and seventeen named individuals--twelve individuals have appealed to this court. The entry of the permanent injunction mooted Docket No. 91-7801, the appeal from the July 22, 1991 preliminary injunction, and that appeal has been dismissed.
 The appeal from the permanent injunction was argued on October 19, 1992. Appellants contend that the district court erred both in finding, as a matter of federal law, that defendants contravened § 1985(3), and in finding, as a matter of state law, that defendants tortiously interfered with the Center's business. Appellants further contend that the § 1985(3) claim was so wide of the mark that the district court lacked federal question subject-matter jurisdiction and hence was without pendent jurisdiction over any state law claims. The Center, in response, defends both of the grounds on which the district court granted summary judgment in the Center's favor and entered a permanent injunction.[8] The Center does not seek to bolster its entitlement to the permanent injunction entered in its favor by arguing that the district court erred in dismissing the Center's RICO claim; but the Center does urge that the district court erred in dismissing the state law trespass claim--a dismissal which, the Center argues, turned on the district court's misapprehension that under Connecticut law a tenant, as distinct from one who has "title," is without standing to sue for trespass.[9]
 I.
 Although the district court sustained claims both under federal law and under state law, we think it plain that the federal law claim is paramount. The district court's determination with respect to federal law was that the appellants contravened that portion of § 1985(3) which makes actionable a conspiracy whose purpose is to deprive "any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...."
 A.
 The Center's § 1985(3) claim alleged that appellants had conspired to deprive, and had in fact deprived, members of the Center's would-be clientele of two federal rights--the right to an abortion and the right to travel. The Center further alleged that appellants were "motivated by an invidiously discriminatory animus directed at the class of women seeking to exercise their constitutional and legal right to choose abortions and other family planning services." This additional allegation was, evidently, designed to bring the Center's pleading within the § 1985(3) framework crafted by the Supreme Court in Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971): "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." (emphasis in original).
 The district court found that appellants were engaged in a conspiracy to abridge the constitutional right to an abortion of women who sought access to the Center and who were barred by appellants' actions from securing the treatment to which they were constitutionally entitled. Recognizing that the constitutional right to an abortion is secured by the Fourteenth Amendment and is, therefore, a right against the state rather than against private persons, the district court concluded that "[d]efendants intentionally frustrated the authorities in their ability and obligation to ensure the women's constitutional rights. Defendants thus caused the violation of the fourteenth amendment by obstructing and preventing the authorities from enforcing women's rights." 792 F.Supp. at 166.
 Turning to the motivation for appellants' conduct, the district court further found that appellants "conspired to deprive women, as a class, of their constitutional right to abortion...." Id. at 167. The district court concluded that a conspiracy which targets, as a class, women who seek to exercise the abortion right is a conspiracy that satisfies the invidious animus ingredient of § 1985(3). As authority for this conclusion the district court relied on, inter alia, this court's opinion in Terry, 886 F.2d at 1359 and the Sixth Circuit's opinion in Volunteer Medical Clinic, 948 F.2d at 225.
 As noted above, the Center alleged that the appellants conspired to effectuate deprivations of two federal rights--the right of women to an abortion and the right to travel. The district court did not explore the Center's second claim: "Having found interference with the constitutional right to abortion, an independent constitutional ground upon which to grant summary judgment on Count I, it is unnecessary to address the arguments regarding the right to travel." 792 F.Supp. at 167-68 n. 7.
 B.
 Appellants advance three principal points in support of their view that the district court's finding of liability under § 1985(3) should be overturned. First, appellants argue that the record does not support the district court's finding that the state was implicated in abridging the abortion rights of the Center's patients. Second, appellants contend that the abortion right is not a "fundamental right," but only a "liberty interest," and hence is not embraced by § 1985(3). Third, appellants urge abandonment by this court of the conclusion, announced in Terry, 886 F.2d at 1358-60, that animus against women seeking abortions satisfies the invidious animus ingredient of § 1985(3). For its part, the Center, while undertaking to defend the rationale adopted by the district court, has continued to press its argument that the record would support--indeed, would require--a finding that appellants have conspired to curtail the right to travel of those who have sought treatment at the Center. Reliance on the right to travel has, from the Center's perspective, the substantial advantage that no state involvement need be proved: the right to travel--a right of national citizenship, not one derivative from the Fourteenth Amendment--is protected against private, as well as against public, interdiction. Griffin, 403 U.S. at 105-06, 91 S.Ct. at 1800-01.
 II.
 Subsequent to the filing of briefs and the presentation of oral arguments in this court, the judicial landscape of § 1985(3) was radically altered.
 On January 13, 1993, the Supreme Court decided Bray v. Alexandria Women's Health Clinic, supra. In Bray, nine women's medical facilities located in the northern Virginia/Metropolitan Washington area sought an injunction to restrain Operation Rescue and others from engaging in anti-abortion demonstrations of an obstructive and trespassory character. The district court, finding an interference with the right to travel that was actionable under § 1985(3), granted injunctive relief. See National Org. For Women v. Operation Rescue, 726 F.Supp. 1483 (E.D.Va.1989). The Fourth Circuit affirmed. See NOW v. Operation Rescue, 914 F.2d 582 (4th Cir.1990) (per curiam). The Supreme Court, speaking through Justice Scalia, reversed. See Bray, --- U.S. ----, 113 S.Ct. 753. The grounds for reversal were two-fold:
 First, the Court concluded that, on the record before it, the plaintiffs had not established the invidious animus ingredient of § 1985(3):
 We said [in Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) ] that "[t]he language [of § 1985(3) ] requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators action." 403 U.S., at 102, 91 S.Ct. at 1798 (emphasis in original).
 We have not yet had occasion to resolve the "perhaps"; only in Griffin itself have we addressed and upheld a claim under § 1985(3), and that case involved race discrimination. Respondents assert that there qualifies alongside race discrimination, as an "otherwise class-based, invidiously discriminatory animus" covered by the 1871 law, opposition to abortion. Neither common sense nor our precedents support [sic ] this.
 To begin with, we reject the apparent conclusion of the District Court (which respondents make no effort to defend) that opposition to abortion constitutes discrimination against the "class" of "women seeking abortion." Whatever may be the precise meaning of a "class" for purposes of Griffin 's speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid. Ibid. As Justice Blackmun has cogently put it, the class "cannot be defined simply as the group of victims of the tortious action." Carpenters, supra [Carpenters v. Scott, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) ], at 850, 103 S.Ct., at 3367 (Blackmun, J., dissenting). "Women seeking abortion" is not a qualifying class.
 
 
 1
 Respondents' contention, however, is that the alleged class-based discrimination is directed not at "women seeking abortion" but at women in general. We find it unnecessary to decide whether that is a qualifying class under § 1985(3), since the claim that petitioners' opposition to abortion reflects an animus against women in general must be rejected. We do not think that the "animus" requirement can be met only by maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination against women. It does demand, however, at least a purpose that focuses upon women by reason of their sex --for example (to use an illustration of assertedly benign discrimination), the purposes of "saving" women because they are women from a combative, aggressive profession such as the practice of law. The record in this case does not indicate that petitioners' demonstrations are motivated by a purpose (malevolent or benign) directed specifically at women as a class; to the contrary, the District Court found that petitioners define their "rescues" not with reference to women, but as physical intervention " 'between abortionists and the innocent victims,' " and that "all [petitioners] share a deep commitment to the goals of stopping the practice of abortion and reversing its legalization." 726 F.Supp., at 1488. Given this record, respondents' contention that a class-based animus has been established can be true only if one of two suggested propositions is true: (1) that opposition to abortion can reasonably be presumed to reflect a sex-based intent, or (2) that intent is irrelevant, and a class-based animus can be determined solely by effect. Neither proposition is supportable.
 
 
 2
 --- U.S. at ---- - ----, 113 S.Ct. at 759-60.[10]
 
 
 3
 Second: The Court also concluded that, on the record before it, the plaintiffs had not established that defendants intended to hinder the right to travel:
 
 
 4
 Our discussion in Carpenters makes clear that it does not suffice for application of § 1985(3) that a protected right be incidentally affected. A conspiracy is not "for the purpose" of denying equal protection simply because it has an effect upon a protected right. The right must be "aimed at," 463 U.S., at 833, 103 S.Ct., at 3358 (emphasis added); its impairment must be a conscious objective of the enterprise. Just as the "invidiously discriminatory animus" requirement, discussed above, requires that the defendant have taken his action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," [Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) ] so also the "intent to deprive of a right" requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it. That was not shown to be the case here, and is on its face implausible. Petitioners oppose abortion, and it is irrelevant to their opposition whether the abortion is performed after interstate travel.
 
 
 5
 Respondents have failed to show a conspiracy to violate the right of interstate travel for yet another reason: petitioners' proposed demonstrations would not implicate that right. The federal guarantee of interstate travel does not transform state-law torts into federal offenses when they are intentionally committed against interstate travelers. Rather, it protects interstate travelers against two sets of burdens: "the erection of actual barriers to interstate movement" and "being treated differently" from intrastate travelers. Zobel v. Williams, 457 U.S. 55, 60, n. 6, 102 S.Ct. 2309, 2313, n. 6, 72 L.Ed.2d 672 (1982). See Paul v. Virginia, 8 Wall. 168, 180, 19 L.Ed. 357 (1868) (Art. IV, § 2 "inhibits discriminating legislation against [citizens of other States and] gives them the right of free ingress into other States, and egress from them"); Toomer v. Witsell, 334 U.S. 385, 395, 68 S.Ct. 1156, 1161, 92 L.Ed. 1460 (1948) (Art. IV, § 2 "insure[s] to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy"). As far as appears from this record, the only "actual barriers to movement" that would have resulted from Petitioners' proposed demonstrations would have been in the immediate vicinity of the abortion clinics, restricting movement from one portion of the Commonwealth of Virginia to another. Such a purely intrastate restriction does not implicate the right of interstate travel, even if it is applied intentionally against travelers from other States, unless it is applied discriminatorily against them. That would not be the case here, as respondents conceded at oral argument.
 
 
 6
 --- U.S. at ---- - ----, 113 S.Ct. at 762-63 (footnotes omitted).
 
 A.
 
 7
 By letter dated January 15, 1993, appellants have moved this court "to vacate the permanent injunction and remand with instructions to dismiss the case as it did previously in the earlier appeal [Town of West Hartford v. Operation Rescue, 915 F.2d 92 (2d Cir.1990) ]." Appellants rely on Bray, which they describe as holding "that 42 U.S.C. § 1985(3) does not provide a federal cause of action against persons obstructing access to abortion clinics."
 
 
 8
 To the extent that appellants are contending that Bray forecloses all resort to § 1985(3) in all instances involving "persons obstructing access to abortion clinics," we think appellants have over-read what the Court announced. To be sure, the Court in Bray held, with respect to the animus ingredient of § 1985(3), that (1) women seeking abortions do not constitute a class protected by § 1985(3), and (2), if women in general constitute a class protected by the statute--a question the Court found no need to answer--"the claim that petitioners' opposition to abortion reflects an animus against women in general must be rejected." --- U.S. at ----, 113 S.Ct. at 759. But we are of the view that the Court's analysis of the animus aspect of Bray is tied to the facts there adduced:--"[t]he record in this case," --- U.S. at ----, 113 S.Ct. at 759; "[g]iven this record." Id. at ----, 113 S.Ct. at 760. Accordingly, we think that an assessment of the animus aspect of the case at bar requires a further review, in the light of the legal principles relating to animus announced in Bray, of the record evidence bearing on appellants' motivation.
 
 
 9
 In similar fashion, a determination of whether appellants intended to and did inhibit a right protected by § 1985(3)--either the Fourteenth Amendment abortion right, protected against the state; or the citizenship right to travel without public or private impediment--calls for scrutiny of the instant record through the prism of the Bray Court's pronouncement that "impairment [of the right] must be a conscious objective of the enterprise." --- U.S. at ----, 113 S.Ct. at 762.
 
 
 10
 Since, in the case at bar, (1) the district court's findings with respect to animus require reappraisal, and (2) the district court saw no occasion to make findings on the allegations of interference with the right to travel, we think that the task of revisiting testimony that the district court heard and we did not is best entrusted to the district court. Accordingly, we will remand this case to the district court for further consideration in the light of Bray.[11]
 
 
 11
 As a corollary of our remand order, we will vacate the permanent injunction.[12] Since the permanent injunction, and the preliminary injunction that it replaced, were products of (1) a construction of § 1985(3),[13] and (2) an attendant balancing of equities, substantially less demanding than that seemingly mandated by Bray, we think that vacating the permanent injunction will put the district court in a position to consider the case entirely afresh.[14]
 
 B.
 
 12
 Appellants, in their letter of January 15, ask that our remand order direct that any pendent state claims be disregarded and the case dismissed. Appellants cite this court's disposition of the first phase of this case--vacating the preliminary injunction secured by the Town in 1989, and remanding with directions to dismiss the Town's complaint. 915 F.2d at 104-05--as pertinent authority. But there this court determined that the Town's RICO claim--which was at that stage the only surviving federal claim--was so insubstantial that the district court lacked federal subject-matter jurisdiction and hence was without power to entertain pendent state claims. That determination is not apposite here. What is squarely apposite--and, indeed, controlling--is the Court's disposition of the identical request in Bray. There, after explaining (1) why the district court's § 1985(3) right-to-travel injunction against petitioners' anti-abortion demonstrations was unwarranted, and (2) that, as a corollary, the award of attorney's fees and costs to respondents must also be vacated, the Court said:
 
 
 13
 Petitioners seek even more. They contend that respondents' § 1985(3) claims were so insubstantial that the District Court lacked subject-matter jurisdiction over the action, including the pendent state claims; and that the injunction should therefore be vacated and the entire action dismissed. We do not agree. While respondents' § 1985(3) causes of action fail, they were not, prior to our deciding of this case, "wholly insubstantial and frivolous," Bell v. Hood, 327 U.S. 678, 682-83 [66 S.Ct. 773, 776, 90 L.Ed. 939] (1946), so as to deprive the District Court of jurisdiction.
 
 
 14
 It may be, of course, that even though the District Court had jurisdiction over the state-law claims, judgment on those claims alone cannot support the injunction that was entered. We leave that question for consideration on remand.
 
 
 15
 Bray, --- U.S. at ----, 113 S.Ct. at 768.
 
 Conclusion
 
 16
 For the foregoing reasons, the permanent injunction entered by the district court on May 12, 1992 is vacated[15] and the case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Section 1985(3) provides:
 If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
 42 U.S.C. § 1985(3) (1988).
 
 
 [2]
 Judge Kearse, in dissent, disagreed with the court's holding that the RICO claim was so patently unmeritorious that the district court lacked subject-matter jurisdiction. See 915 F.2d at 105 (Kearse, J., dissenting)
 
 
 [3]
 "Private" nuisance, as distinct from the claim of "public" nuisance asserted by the Town. Summit's nuisance claim was dismissed on January 31, 1990
 
 
 [4]
 The ground for dismissal of the RICO claim was that "[w]hile plaintiff has clearly demonstrated that it has suffered economic consequences due to defendants' actions, this is not the type of financial loss that the Second Circuit has construed the RICO statute to require," since defendants' "clearly expressed purpose is to stop the performance of abortions, not to make money." 792 F.Supp. at 168. The district court found controlling this court's decisions in United States v. Ferguson, 758 F.2d 843 (2d Cir.), cert denied, 474 U.S. 841, 106 S.Ct. 124, 125, 88 L.Ed.2d 102 (1985); United States v. Bagaric, 706 F.2d 42 (2d Cir.), cert. denied, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); and United States v. Ivic, 700 F.2d 51 (2d Cir.1983), and hence rejected the construction of RICO adopted by the Third Circuit in Northeast Women's Center, Inc. v. McMonagle, 868 F.2d 1342 (3d Cir.), cert. denied, 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989). See 792 F.Supp. at 168-69
 
 
 [5]
 The district court's rationale for dismissing the trespass claim was that "[t]o state a claim for trespass under Connecticut law, plaintiff '[m]ust prove possession, title and the absence of actual exclusive possession by another,' " and the Center "neither alleges nor demonstrates that it holds title to the grounds in question." 792 F.Supp. at 169 (citations omitted)
 
 
 [6]
 Having found in the Center's favor on claims predicated on the intentionality of defendants' conduct, the district court dismissed the Center's negligence claim, a pleading presented as an alternative to the claims sounding in intentionality
 
 
 [7]
 We assume--in the absence of any statement to the contrary by the district court--that the district court rested its injunction on both of the claims, federal and state, that it sustained. See infra note 12
 
 
 [8]
 The Center also contends that two of the appellants--Joseph M. Scheidler and Randall A. Terry--are without standing to appeal from the permanent injunction because default judgments were entered against them in the district court in 1990 and they did not participate in the proceedings on summary judgment. See infra note 13
 
 
 [9]
 See supra note 5
 
 
 [10]
 The Court's opinion continued:
 As to the first: Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews. But opposition to voluntary abortion cannot possibly be considered such an irrational surrogate for opposition to (or paternalism towards) women. Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of or condescension toward (or indeed any view at all concerning) women as a class--as is evident from the fact that men and women are on both sides of the issue, just as men and women are on both sides of petitioners' unlawful demonstrations. See Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. ----, ----, 112 S.Ct. 2791, 2806, 120 L.Ed.2d 674 (1992).
 Respondents' case comes down, then, to the proposition that intent is legally irrelevant; that since voluntary abortion is an activity engaged in only by women, to disfavor it is ipso facto to discriminate invidiously against women as a class. Our cases do not support that proposition. In Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), we rejected the claim that a state disability insurance system that denied coverage to certain disabilities resulting from pregnancy discriminated on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment. "While it is true," we said, "that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification." Id., at 496, n. 20, 94 S.Ct., at 2492 n. 20. We reached a similar conclusion in Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), sustaining against an Equal Protection Clause challenge a Massachusetts law giving employment preference to military veterans, a class which in Massachusetts was over 98% male, id., at 270, 99 S.Ct., at 2291. " 'Discriminatory purpose,' " we said, "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id., at 279, 99 S.Ct., at 2296 (citation omitted). The same principle applies to the "class-based, invidiously discriminatory animus" requirement of § 1985(3).
 --- U.S. at ---- - ----, 113 S.Ct. at 760-61 (footnotes omitted).
 
 
 [11]
 Also, we think that on remand it would be well for the district court to reconsider, in the light of Carpenters v. Scott, 463 U.S. 825, 830-34, 103 S.Ct. 3352, 3357-59, 77 L.Ed.2d 1049 (1983), the state involvement aspect of the Center's claim of interference with the abortion right
 
 
 [12]
 A question not raised on this appeal, and which we have therefore not addressed, is whether § 1985(3), which expressly contemplates "the recovery of damages," also authorizes injunctive relief. The Court in Bray found it unnecessary to address that question "[b]ecause of our disposition of this case." --- U.S. at ---- n. 16, 113 S.Ct. at 767 n. 16
 
 
 [13]
 As pointed out in note 7, supra, we assume that the district court rested its permanent injunction on both the § 1985(3) claim (interference with the abortion right) and the state law claim (tortious interference with business) that it sustained
 
 
 [14]
 To this end we will vacate the permanent injunction in its entirety. We will not, as the Center would have us do, maintain the injunction in force for Messrs. Terry and Scheidler who, the Center contends, discontinued participation in the proceedings in the district court prior to the summary judgment proceedings and thereby lost standing to appeal. See supra note 8; 10 Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2690 (1983)
 
 
 [15]
 In deciding to vacate the permanent injunction and to remand this case to the district court we have not considered whether the Center's evidence establishes a claim under that portion of § 1985(3) which makes it actionable "[i]f two or more persons in any State or Territory conspire or go in disguise on the highway ... for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws...." No such allegation was included in the § 1985(3) count (Count I) of the second amended complaint. No pleading or brief so formulating the Center's § 1985(3) claim was referred to by the district court in its opinion accompanying its disposition of the summary judgment motions and its entry of a permanent injunction. Nor has any such characterization of the Center's contentions been advanced on this appeal