**UPPER HUDSON PLANNED PARENTHOOD, INC.,**
Plaintiff,

v.

**John DOE, Jane Doe, XYZ Corporation, Francis Benjamin, Dominick J. Brignola, Larry Crandall, Margaret Crossett, Randall Deschamps, Marjorie Dujack, Frank Fonseca, Sue Halbedel, Stephen Lawlor, Emerson Martin, Jr., Francis Murray, Linda Varriale, Joseph Vittolo, Dennis Wolterding, Heather Birnbaum, Jefferson Daniels, Paul Kerin, Gary Winn, Citizens Concerned for Human Life, Inc., Full Gospel Community Church, Operation Rescue, Inc., and People Concerned for People, Inc. Defendants.**

No. 90–CV–1084.

United States District Court,
N.D. New York.

Oct. 18, 1993.

Pattison, Sampson Law Firm, Troy, NY, for plaintiff; Gerald H. Katzman, of counsel.

A. Lawrence Washburn, Jr., New York City, for defendants Benjamin, Crossett, Dujack, Halbedel, Martin and Varriale.

Kriss, Kriss Law Firm, Albany, NY, for defendants Crandall, Deschamps, Lalor, Murray, Wolterding, Daniels, Kerin, Citizens Concerned for Human Life, Inc., and Full Gospel Community Church; Charles R. Kriss, of counsel.

Dominick J. Brignola, pro se.

Joseph Vittolo, pro se.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### INTRODUCTION

This action is one of the countless lawsuits which have been filed across the country as the national debate regarding abortion continues to rage. It pits Upper Hudson Planned Parenthood ("UHPP"), a provider of women's reproductive health care services,

942

including first trimester abortions,[1] against antiabortion activists. The primary legal theory advanced by UHPP is the same one which numerous other beleaguered abortion providers have resorted to as peaceful antiabortion demonstrators have become increasingly violent in their tactics.[2] As a means of preventing antiabortion activists from, among other things, engaging in unlawful conduct such as trespassing, these providers have turned to 42 U.S.C. § 1985(3),[3] commonly referred to as the Ku Klux Klan Act.[4] The thrust of UHPP's § 1985(3) argument is that the defendant protestors have entered into a conspiracy to deprive UHPP's patients of the following asserted rights: to choose an abortion; to travel interstate and to travel intrastate. In addition to this federal cause of action, in its amended complaint UHPP asserts eight other state law based causes of action.[5]

UHPP's three facilities have not been the target of antiabortion protests in the same way as have other similar clinics in, for example, Buffalo, New York[6] and Wichita, Kansas,[7] where Operation Rescue members and others have traveled from around the country to participate in antiabortion activities at clinics in those communities. Nevertheless, as a provider of abortion services, UHPP has not escaped the wrath of antiabortion activists in the Capitol District. Although UHPP had been the target of some antiabortion protests prior to 1988, it was not until December 8, 1988, that UHPP experienced the full impact of such protests. On that date, UHPP's Hudson clinic was the site of a blockade by antiabortion activists, in-

1. After the first trimester, UHPP patients are referred to other facilities which perform late trimester abortions.

2. See Ex parte Reverend Keith Tucci, 859 S.W.2d 1, 7 (Tex.1993) (concurring opinion substituted July 14, 1993) (citing, inter alia, David A. Grimes, Jacqueline D. Forrest, Alice L. Kirkman & Barbara Radford, An Epidemic of Antiabortion Violence in the United States, 165 Am.J. of Obstetrics and Gynecology 1263 (1991)); see also Bray v. Alexandria Women's Health Clinic, — U.S. —, ——–——, & n. 10, 113 S.Ct. 753, 780–81 & n. 10, 122 L.Ed.2d 34 (1993) (Stevens, J., dissenting) (detailing incidents of violence, vandalism and blockading by Operation Rescue).

3. In its entirety, that statute reads as follows:
 If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the law; or if two or more persons conspire to prevent by force, intimidation, or threat any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or prop-

erty, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against one or more of such conspirators.
42 U.S.C. § 1985(3) (West 1981).

4. This statute is so called because originally it was enacted to provide a form of redress for American blacks whose constitutional rights were being deprived by members of the Ku Klux Klan.

5. Those causes of action are as follows: (1) trespass; (2) violations of § 40-c of the New York Civil Rights Law and §§ 296(2) and (6) of the New York Executive Law; (3) intentional infliction of emotional distress; (4) tortious harassment; (5) false imprisonment; (6) interference with contractual and business relationships; and (7) defamation. UHPP is also seeking to recover for economic injury which it sustained in an organizational capacity, but the legal theory upon which such recovery is sought is not readily apparent from the face of the amended complaint.

6. In the spring of 1992, the "pro-life" movement converged on Buffalo for what was called the "Spring of Life." Pro-Choice Network v. Project Rescue Western New York, 828 F.Supp. 1018, 1029 (W.D.N.Y.1993). Those protests resulted in criminal contempt charges being instituted against six individuals. Id. at 1029.

7. See, e.g., Women's Health Care Services v. Operation Rescue, 773 F.Supp. 258, 261–63 (D.Kan. 1991) (detailing Operation Rescue's unlawful activities in Wichita and noting that those activities caused the city "substantial loss and expense").

cluding many of the defendants named herein. UHPP's Executive Director, Ruth Klepper, described it as a "mob scene." The clinic was surrounded by protestors; they were also on the curb and in the parking lot. Some of the protestors were sitting and others were carrying signs. In addition to these descriptions offered by Ms. Klepper, photographs in the record taken the day of this incident show approximately forty protestors, locking arms, three persons deep, completely blocking the door to the Hudson clinic. Plaintiff's exhs. 17 and 18. Overwhelmed by the number of protestors, UHPP's Hudson clinic did not open on schedule that day because access could not be gained to the clinic. Instead, the clinic opened later that day between 2:30 and 3:00 p.m.

Approximately three and a half months later, on March 24, 1989, this time at UHPP's Albany clinic, antiabortion protestors, again many of the defendants, engaged in a "rescue" as that term is commonly used in the "pro-life" community. Ms. Klepper observed a scene of "complete chaos," with far more protestors present than had been at Hudson earlier. She estimated that altogether there were several hundred protestors—many of them singing and chanting. These protestors effectively blocked access to the Albany clinic via the main entrance by standing, tightly grouped, *en masse*, in front of the door. *See, e.g.,* Plaintiff's exh. 82Q. Some of the protestors employed passive resistance techniques when approached by the police. *See* Plaintiff's exhs. 82D and 82 N. According to Ms. Klepper, however, Albany area police did remain near the rear door of the clinic all day, which is not usually used for patient access, to keep it clear of protestors. A few of the defendants were arrested in connection with their activities at Albany on this date.

For reasons unknown to the court, rather than promptly taking some form of legal action in the months immediately following those two rescues, UHPP waited until nearly

18 months after the second rescue—October 9, 1990—to file this action. Named as defendants in this lawsuit are certain individuals whom UHPP believes to be actively involved in the Capitol District antiabortion movement, as well as several entities which allegedly sponsor antiabortion demonstrations outside UHPP's three clinics. Just after the commencement of this lawsuit, UHPP sought a temporary restraining order seeking almost identical relief to that sought on this application for a preliminary injunction. The court denied that application because, *inter alia,* there was no showing of irreparable harm. After that, this case proceeded in the usual fashion, although, as will be seen, with more than the usual amount of court intervention along the way. Finally, from August 25 through 28, 1992 the court conducted an evidentiary hearing to determine whether UHPP would be entitled to a preliminary injunction.

Following those four days of proof, the court reserved decision and directed the parties to file post-hearing memoranda of law. Before the court rendered its decision, on January 13, 1993, the Supreme Court decided *Bray,* which significantly impacts the present case. The court therefore required the parties to submit supplemental memoranda of law as to the status of this case after *Bray,* and that was done. The court has now had an opportunity to carefully examine the applicable law (which, as will be seen, was not an easy task given the state of flux of § 1985(3) jurisprudence [8]), and to consider the numerous exhibits, including photographs and videotapes taken at UHPP clinics when defendant protestors were present, which were proffered at the preliminary injunction hearing. Following constitutes the court's decision in this regard.

## DISCUSSION [9]

Before determining whether UHPP is entitled to a preliminary injunction, there are

---

**8.** In *Stevens v. Tillman,* 855 F.2d 394 (7th Cir. 1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989), the Seventh Circuit observed that, "Changing interpretation has been the only constant about § 1985(3)." *Id.* at 405. And, as the discussion herein will show,

with *Bray* § 1985(3) jurisprudence continues to remain in a state of flux.

**9.** Counsel engaged in a "letter war" requesting the court to consider or not various post-*Bray* submissions. The court has considered *all* of the

several critical issues which the court must resolve. First, the court must decide whether, as the defendants urge, after the Supreme Court's decision in *Bray, supra,* UHPP's § 1985(3) cause of action should be dismissed. If that issue is resolved unfavorably to UHPP, then the issue becomes whether the court should exercise pendent jurisdiction [10] over UHPP's remaining eight state law based causes of action. Only after those two issues are decided will the court be in a position to decide whether UHPP is entitled to the injunctive relief which it is seeking.

## I. Section 1985(3)

As the Second Circuit aptly stated, on January 13, 1993, the day the Supreme Court decided *Bray, supra,* "the judicial landscape of § 1985(3) was radically altered." *Town of West Hartford v. Operation Rescue,* 991 F.2d 1039, 1045 (2d Cir.1993). The impetus for *Bray* was an announcement by the by now well-known antiabortion organization, Operation Rescue, that it planned to demonstrate at abortion clinics in the Washington, D.C. area. The plaintiffs, nine women's medical facilities, sought injunctive relief to restrain Operation Rescue, among others, from engaging in demonstrations which were obstructive (i.e. blockading and/or rescuing) and trespassory in nature. The district court granted the plaintiffs' application for a permanent injunction. In so doing, the district court found that plaintiffs' members and patients "constitute a sub-set of a gender-based class," that is "women seeking abortions," thus satisfying the requirement of a "class-based discriminatory animus" established in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). *National Organization for Women v. Operation Rescue,* 726 F.Supp. 1483, 1492 (E.D.Va.1989) (*"Bray I"*).[11] Further, relying in part upon testimony that the plaintiff clinics serve out-of-state patients, the district court further found that the conspiracy there deprived women seeking abortions and related medical and counseling services of the constitutionally protected right to travel interstate. *Id.* at 1493. On appeal the Fourth Circuit affirmed. *National Organization for Women v. Operation Rescue,* 914 F.2d 582 (4th Cir.1990) (*"Bray II"*). The Supreme Court disagreed, however, and reversed on several grounds.

The first ground pertained to the lower court's interpretation of the "class-based invidiously discriminatory animus" require-

numerous memoranda and letters, with accompanying attachments, submitted in connection with the preliminary injunction hearing. The court's docket sheet reflects that at the March 3, 1993 conference with the court, counsel were directed to file and serve any replies to their supplemental memoranda no later than May 1, 1993. *See* Docket Entry # 70. And even though UHPP's Reply Memorandum of Law was not filed and served by that date, the court has nonetheless considered it. In the court's view, there is no sound reason to refuse to consider that memorandum under the circumstances of this case—i.e., it is a case dealing with extremely controversial issues about which there has and continues to be much litigation—and thus any additional analysis which the parties can provide to the court is helpful. Moreover, as all counsel should be fully aware from practicing before this court for three years, generally unless a party will be prejudiced, the court prefers to resolve issues on the merits and not on procedural technicalities, especially where, as here, the procedural deficiency is so inconsequential.

10. This lawsuit was commenced prior to December 1, 1990—the effective date of 28 U.S.C. § 1367, which provides for "supplemental" as opposed to pendent jurisdiction. In this case then pendent rather than supplemental jurisdiction is the applicable doctrine. However because, as the Second Circuit has observed, § 1367 simply "codif[ied] existing caselaw" regarding pendent jurisdiction, reference to pendent or supplemental jurisdiction, at least in the context of this case, is actually just a matter of semantics. *See Castellano v. Board of Trustees,* 937 F.2d 752, 758 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 378, 116 L.Ed.2d 329 (1991). Nonetheless, to be completely accurate the court notes this distinction.

11. Since then several other courts, employing similar reasoning, have granted preliminary injunctions. *See, e.g., Pro–Choice Network of Western New York v. Project Rescue,* 799 F.Supp. 1417 (W.D.N.Y.1992); *Planned Parenthood v. Holy Angels Catholic Church,* 765 F.Supp. 617 (N.D.Cal. 1991); *Women's Health Care Services v. Operation Rescue–National,* 773 F.Supp. 258 (D.Kan. 1991); and *Cousins v. Terry,* 721 F.Supp. 426 (N.D.N.Y.1989) (McCurn, C.J.); *see also New York State NOW v. Terry,* 886 F.2d 1339 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990) (affirming grant of permanent injunction).

ment of § 1985(3). Reviewing *Griffin*,[12] the Supreme Court in *Bray* unequivocally held that, "'Women seeking abortion'" are not a qualifying class[ ]" for purposes of § 1985(3). —— U.S. at ——, 113 S.Ct., at 759. Rejecting the view that opposition to abortion reflects an animus against women, the Court expressly declined to decide however whether, as the clinics argued, women in general would qualify as a class under § 1985(3). *Id.* The Court went on to opine though:

> We do not think that that the "animus" requirement can be met only by maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination against women. It does demand, however, at least a purpose that focuses upon women *by reason of their sex*—for example (to use an illustration of assertedly benign discrimination), the purpose of "saving" women *because they are women* from a combative, aggressive profession such as the practice of law. The record in this case does not indicate that petitioners' demonstrations are motivated by a purpose (malevolent *or* benign) directed specifically at women as a class; to the contrary, the District Court found that petitioners define their "rescue" not with reference to women, but as physical intervention "'between abortionists and the innocent victims,'" and that "all [petitioners] share a deep commitment to the goals of stopping the practice of abortion and reversing its legalization." 726 F.Supp., at 1488. Given this record, respondents' contention that a class-based animus has been established can be true only if one of two suggested propositions is true: (1) that

opposition to abortion can reasonably be presumed to reflect a sex-based intent, or (2) that intent is irrelevant, and a class-based animus can be determined solely by effect. Neither proposition is supportable. *Id.* —— U.S. at ——, 113 S.Ct. at 759–60 (emphasis in original).

The second ground for the *Bray* Court's reversal was that the clinics failed to identify any "right protected against private action that [was] the object of the alleged conspiracy." *Id.* at ——, 113 S.Ct. at 764. The Supreme Court found that even though substantial numbers of women seeking the services of the plaintiff clinics traveled interstate to do so, that was not enough to show that the defendants intended to deprive those women of the right to interstate travel. *Id.* at ——–——, 113 S.Ct. at 762–63. In reaching that conclusion, the *Bray* Court reasoned:

> Our discussion in [*United Brotherhood of*] *Carpenters* [ *& Joiners of America Local 610 AFL–CIO v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) ] makes clear that it does not suffice for application of § 1985(3) that a protected right be incidentally affected. A conspiracy is not "for the purpose" of denying equal protection simply because it has an effect upon a protected right. The right must be "*aimed at,*" 463 U.S., at 833, 103 S.Ct., at 3358 (emphasis added); its impairment must be a conscious objective of the enterprise..... [t]he "intent to deprive of a right" requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of pro-

---

12. The *Bray* Court explained the origins of this judicially created limitation on liability under § 1985(3) as follows:

> In *Griffin* this Court held, reversing a 20-year-old precedent, ..., that § 1985(3) reaches not only conspiracies under color of state law, but also purely private conspiracies. In finding that the text required that expanded scope, however, we recognized the 'constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law.' *Griffin*, 403 U.S., at 102, 91 S.Ct., at 1798. That was to be avoided, we said, 'by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed

by the sponsor of the limiting amendment,' *ibid.*—citing specifically Representative Shellabarger's statement that the law was restricted "to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies...." *Id.*, at 100, 91 S.Ct., at 1797 (emphasis in original), quoting Cong.Globe, 42d Cong., 1st Sess., App. 478 (1871).

> *Bray,* —— U.S., at ——, 113 S.Ct., at 758–59 (citation omitted).

ducing it. That was not shown to be the case here, and is on its face implausible. Petitioners oppose abortion, and it is irrelevant to their opposition whether the abortion is performed after interstate travel.

*Id.* (footnote omitted). The second reason given by the Supreme Court for holding that the clinics had failed to show a conspiracy to violate the right of interstate travel was that the demonstrators' activities did not implicate that right. *Id.* The Court explained that that right was not implicated under the facts presented therein because there was no "actual barrier to interstate movement;" nor was there a showing that the protestors' actions resulted in interstate travelers being treated differently than intrastate travelers. *See id.*

Finally, even though the district court did not rely upon a right to abortion theory to sustain the § 1985(3) cause of action, the Supreme Court reasoned that § 1985(3) "applies only to [private] conspiracies ... 'aimed at interfering with rights ... protected against private, as well as official, encroachment[,]" and "[t]he right to abortion is not among them." *Id.* at —, 113 S.Ct. at 764

(quoting *Carpenters, supra,* 463 U.S., at 833, 103 S.Ct., at 3358).

Significantly, in addressing the elements of a § 1985(3) cause of action, the majority in *Bray* did so in the context of a claim brought under the first clause of that statute or what is sometimes referred to as the "deprivation" clause.[13] However, because it was the subject of much discussion by the dissenters, Justice Scalia, writing for five members of the Court, did discuss the second clause of § 1985(3), which is sometimes referred to as the "hindrance" or "prevention" clause.[14] Relying exclusively upon *Bray*, the defendants offer several reasons as to why UHPP's § 1985(3) claim must be dismissed.[15] Focusing on the retroactivity principles enunciated by the Supreme Court in *James B. Beam Distilling Co. v. Georgia,* 501 U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), the Washburn defendants argue, rather simplistically, that after *Bray*, UHPP's § 1985(3) cause of action is so insubstantial that the complaint must be dismissed in its entirety for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(h)(3).[16]

The Kriss defendants take a different approach. Recognizing that the majority in

13. *See infra* n. 1.

14. *See id.*

15. To avoid confusion, the court has divided the defendants into two groups based upon the names of their respective counsel. Except when being discussed individually, defendants Frank Benjamin, Margaret–Mary Crossett, Marjorie Du-Jack, Sue Halbedel and Emerson Martin, Jr., represented by A. Lawrence Washburn, Jr., will be referred to throughout as the "Washburn defendants." Defendants Randall Deschamps, Steven Lalor, Francis Murray, Dennis Wolterding, Jefferson Daniels, Paul Kerin, Citizens Concerned for Human Life and Full Gospel Community Church, represented by Charles T. Kriss, will be referred to throughout as the "Kriss defendants."

The court recognizes that defendant Dominick Brignola was originally represented by Mr. Kriss. Ignoring the old adage, however, that "a lawyer who represents himself has a fool for a client," *see Kay v. Ehrler,* 499 U.S. 432, 438, 111 S.Ct. 1435, 1438, 113 L.Ed.2d 486 (1991); and *Faretta v. California,* 422 U.S. 806, 852, 95 S.Ct. 2525, 2549, 45 L.Ed.2d 562 (1975) (Blackmun, J., dissenting), five days before the commencement of the preliminary injunction hearing, Mr. Brignola elected to represent himself and did so through-

out that hearing. (Fortunately for Mr. Brignola in this case, that old adage did not prove true.) Even though Mr. Brignola has represented himself, the court is including him in the group of Kriss defendants because not only was he originally represented by Mr. Kriss, but he has remained closely allied with those defendants as is evidenced by the fact that he did not submit a post-hearing memorandum of law, but instead choose to join in the one submitted by those Kriss defendants.

As to defendant Joseph Vittolo, who is proceeding *pro se,* unless otherwise indicated, the court also groups him with the Kriss defendants because since the outset he has had an obviously close affiliation with Mr. Kriss and indeed, at the preliminary injunction hearing, it appeared at times that Mr. Kriss was acting in an advisory capacity to Mr. Vittolo. Finally, because Mr. Vittolo did not submit a post-hearing memorandum of law or any other written submission, as directed to do so by the court, presumably he agrees with the positions advanced by the Kriss defendants.

16. That Rule states: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court *shall* dismiss the action." Fed.R.Civ.P. 12(h)(3) (emphasis added).

*Bray* addressed only § 1985(3)'s deprivation clause,[17] the Kriss defendants argue that UHPP cannot avoid the clear mandate of *Bray,* which they believe is outright dismissal of the § 1985(3) claim, by now relying upon the prevention clause of that statute. More specifically, the defendants[18] assert that UHPP cannot, with the advantage of hindsight, avoid dismissal of its § 1985(3) cause of action based upon a purported prevention clause claim because such a claim was not alleged in the amended complaint. Next, they argue that even if the amended complaint can be read as alleging a claim under the prevention clause, such claim must fail because under *Bray* the class-based animus requirement essential to a deprivation clause claim applies equally to a prevention clause claim. Third, again assuming UHPP did properly assert a prevention clause claim, such claim cannot form the basis for a cause of action under § 1985(3) because, in the defendants' opinion, *Bray* requires more than an incidental impact on intrastate travel to support such a claim.

After *Bray,* UHPP is willing to concede that its § 1985(3) deprivation claim must be dismissed, but only insofar as it is based upon an interference with the right to interstate travel. Even post-*Bray,* UHPP maintains that it has a viable deprivation claim under § 1985(3) based upon an alleged interference with intrastate travel. UHPP is also willing to concede that *Bray* requires dismissal of its § 1985(3) deprivation clause claim against some but not all of the defendants. In particular, UHPP contends that as to defendants Benjamin, Crossett, Halbedel, Lawlor, Martin and Dujack, there is an admission in their answer which supplies the necessary class-based animus which the Supreme Court found lacking in *Bray.* Therefore, UHPP believes that it should be allowed to proceed against those defendants on a deprivation clause theory of liability. UHPP further asserts that, in any event, it still has a viable § 1985(3) cause of action against all of the defendants based upon the prevention clause because the Supreme

Court in *Bray* did not hold that a class-based animus is a necessary element of such a claim. In addition, in what seems to be an alternative argument, although not couched in those terms, UHPP asserts that, nevertheless, a class-based animus has been established here based upon what UHPP believes are admissions of some of the defendants that their activities are directed at women.

Because there is no dispute that UHPP's § 1985(3) cause of action encompasses a deprivation claim thereunder, the court will first address the impact of *Bray* on that claim. The court will then move on to consider whether UHPP has also pleaded a § 1985(3) cause of action based upon the prevention clause; and, if it has, whether the present record supports such a claim after *Bray.* Then, finally, in this section the court will consider whether *Bray* mandates dismissal of this action in its entirety, as the Washburn defendants alone strongly urge.

### A. "Deprivation" Clause

█ As just mentioned, it is UHPP's position that even in the wake of *Bray,* it can still maintain a § 1985(3) cause of action based upon the deprivation clause of that statute because *Bray* considered such a cause of action only in the context of an asserted interference with the right to interstate travel, whereas UHPP also bases this particular claim upon interference with the right to intrastate travel. The Court in *Bray* did not consider whether interference with intrastate, as opposed to interstate, travel can form the basis for a deprivation clause claim. Nonetheless, *Bray* is instructive on this issue.

Assuming *arguendo* that even after *Bray* an alleged infringement upon the right to intrastate travel could support a § 1985(3) deprivation clause claim in this setting (something about which the court now has serious reservations), this claim by UHPP still cannot survive the defendants' motion to

---

17. Justice Scalia seemingly addressed the prevention clause only because the dissenters made it an issue. *See Bray,* —— U.S. at ——-——, 113 S.Ct. at 764–67.

18. In their Reply Memorandum of Law, the Washburn defendants joined in this argument without adding any additional analysis of their own.

dismiss.[19] The *Bray* Court reaffirmed the view "that it does not suffice for application of § 1985(3) that a protected right be incidentally affected." *Bray*, —— U.S. at ——, 113 S.Ct. at 762. As previously stated, the Supreme Court clearly wrote, "[t]he right must be '*aimed at*,' ... (emphasis added); its impairment must be a conscious objective of the enterprise." *Id.* (quoting *Carpenters*, 463 U.S., at 833, 103 S.Ct., at 3358). There has been no showing in the record that any of these defendants acted even "in part" for the purpose of interfering with the right of UHPP's patients to travel intrastate. Even the most liberal reading of the record in this case, cannot support a finding that the "conscious objective" of these defendants was to impair the right of UHPP's patients to travel intrastate. *See id.*

When specifically asked at the hearing, the defendants uniformly and repeatedly stated that the purpose of their activities at UHPP clinics was to "save babies," or to give life (i.e. to persuade women not to have abortions). For example, Michael Schweigert, president of the defendant Citizens Concerned for Human Life ("CCHL") since 1988, testified that the primary purpose of CCHL pickets or demonstrations was to create a "pro-life" presence at UHPP's facilities. In his testimony, Mr. Schweigert further described the purpose of these antiabortion activities in terms of giving life; but in what seems to the court to be rather twisted logic, he disavowed that the purpose was to discourage women from giving birth. In any event, other defendants testified along the same lines. Margaret–Mary Crossett, for example, echoed this common theme, testifying that she too engaged in antiabortion protests motivated by her desire to "save babies." Thus, because there was a complete lack of proof that the defendants acted even in part to deprive UHPP's patients of the right to intrastate travel, the court concludes that after *Bray*, UHPP is not entitled to maintain a § 1985(3) deprivation clause claim premised upon an alleged interference with

that asserted right. Indeed, in the present record there was not even a suggestion by any of the defendants that they were aware of a possible deprivation of the right to intrastate travel. As the Supreme Court plainly stated in *Bray*, when confronted with a record nearly identical to the present one in terms of the defendants' motivation, "[p]etitioners oppose abortion, and it is irrelevant to their opposition whether the abortion is performed after interstate travel." *Id.* at ——, 113 S.Ct. at 763. The same is true here with respect to intrastate travel.

The other argument advanced by UHPP with respect to the deprivation clause need not detain the court for too long. UHPP asserts that as to six of the individual defendants herein a § 1985(3) deprivation clause claim still may be asserted against them because they admitted in their answer the critical class-based animus not present in *Bray*. Even if the court were to agree with UHPP on this point, nonetheless there is no basis for allowing such a claim to stand against these six defendants identified by UHPP because, as just discussed, a section 1985(3) deprivation claim cannot be predicated upon the purported interference with the right to intrastate travel. Consequently, after *Bray* the court is left with no choice but to dismiss UHPP's § 1985(3) cause of action as to all of the defendants insofar as it is based upon the deprivation clause of that statute.

### B. "Prevention" Clause

#### 1. Pleading

In an effort to save its § 1985(3) cause of action from the evidently broad sweep of *Bray*, UHPP asserts that such cause of action is also premised upon the prevention clause. Both the defendants and UHPP spend much time arguing that various allegations in the 28 page, 148 paragraph amended complaint do or do not support a prevention clause claim. As the defendants correctly point out, prior to this preliminary injunction

---

**19.** Although the defendants did not file a formal notice of motion in connection with their post-*Bray* submissions, they plainly sought such relief in their memoranda of law, and UHPP responded accordingly. In addition, it was clear at the

status conference with the court on March 3, 1993, at which all counsel were present, that the defendants intended to seek dismissal of at least the § 1985(3) based cause of action.

hearing, UHPP had been before the court on several occasions, including a motion to dismiss, yet not once, until the March, 1993 status conference did UHPP even mention the possibility of a prevention clause claim or characterize its § 1985(3) cause of action in those terms. Despite that, broadly construing UHPP's amended complaint, the court will assume *arguendo* that it does allege a prevention claim under § 1985(3).[20]

### 2. "Class–Based Invidiously, Discriminatory Animus"

█ The issue thus becomes whether this supposed prevention clause claim should be allowed to stand after *Bray.* The defendants emphatically assert that it should not because the "animus" requirement, so thoroughly discussed in *Bray* with respect to a deprivation clause claim, also applies to a prevention claim. UHPP responds by urging this court to hold that even after *Bray,* the prevention clause does not require a showing of a class-based animus, and thus this aspect of its § 1985(3) cause of action remains viable. Then, in what seems to be an alternative argument, UHPP contends that, in any event, a class-based animus has been established here and so it has properly asserted a prevention clause claim.

The court will first examine whether, as UHPP suggests, after *Bray,* a prevention claim can be maintained even absent a showing of a class-based invidiously, discriminatory animus. As mentioned earlier, the Supreme Court in *Bray,* albeit in the context of a deprivation claim, held that opposition to abortion is not an "otherwise class-based, invidiously discriminatory animus." *Bray,* —— U.S. at ——, 113 S.Ct., at 759. Further, in discussing the ambit of § 1985(3)'s animus requirement, the Supreme Court emphatically stated:

Whatever may be the precise meaning of a 'class' for purposes of Griffin's speculative extension of § 1985(3) beyond race, the term unquestionably connotes something

more than a group of individuals who desire to engage in conduct that the § 1985(3) defendant disfavors.... the class 'cannot be defined simply as the group of victims of the tortious action.'

*Id.* (quoting *Carpenters, supra,* 463 U.S., at 850, 103 S.Ct., at 3367 (Blackmun, J., dissenting)). The Court went on to state:

Whether one agrees or disagrees with the goal of preventing abortion, that goal in itself (apart from the use of unlawful means to achieve it, which is not relevant to our discussion of animus) does not remotely qualify for such harsh description, and for such derogatory association with racism..... This is not the stuff out of which a § 1985(3) "invidiously discriminatory animus" is created.

*Id.* —— U.S. at ——, 113 S.Ct. at 762. While it is true that the *Bray* Court only discussed class-based animus in the context of § 1985(3)'s deprivation clause, nonetheless, prompted by the dissenters thorough examination of the "nonexistent"[21] prevention therein, Justice Scalia opined:

Judging from the statutory text, a cause of action under the "hindrance" clause would seem to require the *same* "class-based, invidiously discriminatory animus" that the "deprivation" clause requires,....

*Id.* at ——, 113 S.Ct. at 765 (emphasis added).

Admittedly that statement is *dicta.* In this court's view, however, if faced with the narrow issue of whether a § 1985(3) prevention claim requires the same showing of class-based animus as does a deprivation claim under that statute, the Supreme Court would, in all likelihood, find that it does. And today this court so holds. Indeed, any other reading of § 1985(3) would, as the Supreme Court implicitly acknowledged in *Bray,* be wholly inconsistent with the plain language of that statute. *See id.* at —— —— ——, 113 S.Ct. at 765–66. In that respect, the Court reasoned, "[w]e said in *Griffin* that

---

20. Whether fortuitous or not, the court notes that in paragraph 92 of the amended complaint, UHPP alleges, "Upon information and belief, local police are unable to ensure access to plaintiff's clinics while defendants are protesting[;]"

and that paragraph is incorporated by reference in the § 1985(3) cause of action. *See* Amended Complaint at 19, ¶ 106.

21. *Bray,* —— U.S. at ——, 113 S.Ct., at 767.

the source of the animus requirement is '[t]he language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities,' 403 U.S., at 102, 91 S.Ct., at 1798 (emphasis in original)—and such language appears in the 'hindrance' clause as well." *Id.* (footnote omitted). The *Bray* Court further reasoned that "[w]ithout a race- or class-based animus requirement, the 'hindrance' clause of this post-Civil War statute would have been an available weapon against the mass 'sit-ins' that were conducted for purposes of promoting desegregation in the 1960's—a wildly improbable result." *Id.* at ——, 113 S.Ct. at 766 (footnote omitted). Thus, although UHPP, not surprisingly, urges this court to adopt the position taken by Justice Souter on this issue,[22] that is that the class-based animus requirement should not be a condition to establishing a prevention clause claim, the court simply cannot ignore the majority's view on this issue. Furthermore, in the only other post-*Bray* decision to date which considered this issue (and of which this court is aware), the court held that, "[a]lthough the *Bray* majority determined that the 'hindrance' clause was not truly before the court, it is unquestionable that it concluded that 'hindrance' claims require the *same* threshold 'class-based' invidiously discriminatory animus ... which the deprivation clause requires." *Lucero v. Operation Rescue of Birmingham*, CV91-PT-1082-S, 1993 WL 503112 slip op. at 5 (N.D.Alabama March 2, 1993) (emphasis added).

■ Because the court has decided that regardless of whether UHPP is alleging a violation of the prevention clause or the de-

privation clause, *Bray* requires a showing of class-based animus, the court must now try to discern whether UHPP has shown that. It is an understatement to say that this is not an easy task. As the portions of *Bray* quoted herein show, the Supreme Court left unanswered many more questions than it answered as to what will satisfy § 1985(3)'s class-based animus requirement. What is painfully clear after *Bray*, however, is that "women seeking abortions" are not a qualifying class under § 1985(3), but that is as far as *Bray* goes.[23]

As can be gleaned from the portions of *Bray* quoted herein, Supreme Court decisions predating *Bray* which address the issue of the scope of § 1985(3)'s class-based animus requirement are few—namely *Griffin* and *Carpenters*. In those two cases the Supreme Court interpreted § 1985(3) as according protection to only a limited class of persons. *See Dwares v. City of New York*, 985 F.2d 94, 101 (2d Cir.1993) (citations omitted). In *Griffin*, where the Supreme Court first delineated the four essential elements of a § 1985(3) cause of action, the Court explicitly declined to decide "whether a conspiracy motivated by invidiously discriminatory intent *other* than racial bias would be actionable under" the deprivation clause of § 1985(3). *Griffin*, 403 U.S., at 102 n. 9, 91 S.Ct., at 1798 n. 9 (emphasis added). After that, however, in *Carpenters*, the Court observed that "[e]ven if the section [1985(3)] must be construed to reach conspiracies aimed at any class or organization on account of its political views or activities, or at any of the classes posited by Senator Edmunds, we

---

**22.** Justice Souter in *Bray* concurred in the judgment .in part and dissented in part. He concurred with the Court's holding as to the deprivation clause claim, but he said that the factors that led the Court in *Griffin* to narrow the applicability of the deprivation clause do not apply to the prevention clause which, in his opinion, contains an additional limiting factor of its own. That is that it requires "conspiracies to act with enough force, of whatever sort, to overwhelm the capacity of legal authority to act evenhandedly in administering the law." *Bray*, —— U.S. at ——, 113 S.Ct., at 775. Justice Souter therefore concluded that a conspiracy falls with the prevention clause "when its purpose is to hinder or prevent law enforcement authorities from giving normal police protection to women attempting to exercise

the right to...." *Id.* at ——, 113 S.Ct. at 777. He thus would have remanded for express findings on whether implementation of the conspiracy alleged therein was actionable under § 1985(3)'s prevention clause. *Id.* at ——, 113 S.Ct. at 779.

**23.** *Bray*, —— U.S. at ——, 113 S.Ct., at 759.

True, this holding arose in the context of a deprivation clause claim. It is practically unthinkable though that the Supreme Court would refuse to recognize "women seeking abortions" as a class for deprivation clause purposes, but that it would recognize such a class under the prevention clause.

find no convincing support in the legislative history for the proposition that the provision was intended to reach conspiracies motivated by bias towards others on account of their *economic* views, status, or activities." *Id.* 463 U.S. at 837, 103 S.Ct., at 3361 (emphasis in original). The Court reached that conclusion despite its observation that "it is a close question whether § 1985(3) was intended to reach any class-based animus *other than* animus against Negroes and those who championed their cause, most notably Republicans." *Carpenters,* 463 U.S., at 836, 103 S.Ct., at 3360 (emphasis added). Thus the court in *Carpenters* held that a nonunion construction company and its employees had no § 1985(3) cause of action against a regional trade council, 25 local unions, and various individuals for damages occurring from an assault on the employees and destruction of construction equipment on the job site. *Bray, Carpenters* and *Griffin* are essentially the only guidance which the Supreme Court has provided on the issue of what constitutes a class-based animus under § 1985(3).

Left to construe *Bray* on its own, UHPP, when pressed,[24] defines the purported class-based, invidiously discriminatory animus at issue here in three different ways. First, according to UHPP, defendants are acting with the intent "to interfere and disrupt the business of a particular provider, . . . ." UHPP Letter to Court (May 11, 1993) ("UHPP Letter") at 2. Second, UHPP describes the defendants' animus as being directed "at women seeking abortions and other *family planning services.*" *Id.* (emphasis

in original). UHPP further reasons that because in its view these defendants "have taken it upon themselves to insert themselves into women's decision making [sic] processes[,]" this provides additional support for the view that a class based animus has been shown. *Id.* at 4. Finally, although not explicit, UHPP seems to be suggesting that, if nothing else, the focus of a class-based animus under § 1985(3) may be women in general. *See* Plaintiff's Reply Memorandum of Law at 4.

The court admits to being somewhat perplexed as to the exact nature of the class-based animus which *Bray* contemplates, at least in a case such as this.[25] Even so, for the reasons set forth below, the court finds that none of these proposed definitions of a class-based, invidiously discriminatory animus are tenable given the current state of § 1985(3) jurisprudence.

### a. Interference with and Disruption of Business

■ Two concerns come readily to mind with respect to UHPP's first purported class-based animus. First, after scrutinizing the amended complaint, the court is unable to find an allegation that defendants intended to "interfere and disrupt" UHPP's business, as UHPP asserts in its May 11, 1993 letter to the court. Second, even if the amended complaint could be read as containing such an allegation, and, as UHPP believes, the proof at the preliminary injunction hearing "estab-

24. These definitions of class-based animus were offered by UHPP in response to the Washburn defendants' supplemental memorandum of law; and as noted herein, with one exception, these definitions do not appear in the amended complaint.

25. The court notes in passing that the Second Circuit's post-*Bray* decision in *Town of West Hartford v. Operation Rescue,* 991 F.2d 1039 (2nd Cir.1993), provides no concrete guidance on this troublesome issue. In *West Hartford,* the Second Circuit vacated a permanent injunction which had been entered against anti-abortion protestors who had interfered with access to facilities offering abortions and related medical services. Citing *Bray,* the antiabortion protestors moved the Court to vacate the injunction and remand with instructions to dismiss. The Second Circuit ex-

plicitly rejected the protestors' contention "that *Bray* forecloses all resort to § 1985(3) in all instances involving 'persons obstructing access to abortion clinics,'" noting that the protestors were, in the Court's view, over reading *Bray. Id.* at 1048. Stating that "the [Supreme] Court's analysis of the animus aspect of *Bray* is tied to the facts there adduced[,]" the Second Circuit agreed that the injunction should be vacated and the case remanded, but significantly, it did not order dismissal on remand. Instead, it directed the district court to assess the animus requirement "in the light of the legal principles relating to animus announced in *Bray, . . . .*" *Id.* (quoting *Bray,* —— U.S. at —— and ——, 113 S.Ct., at 759 and 760). Thus, the Second Circuit left it up to the district court to interpret *Bray* in the first instance.

lished" it,[26] this asserted class-based animus is not sufficient under *Bray.* Allowing defendants' claimed interference and disruption of UHPP's business to satisfy the class-based animus element of § 1985(3) would directly contradict *Bray,* where the Court stated:

> Whatever may be the precise meaning of a "class" for purposes of *Griffin's* speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendants disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy could convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid.... As Justice Blackmun has cogently put it, the class "cannot be defined simply as the group of victims of the tortious action." *Carpenters, supra* [*Carpenters v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) ], at 850, 103 S.Ct., at 3367....

*Bray,* —— U.S. at ——, 113 S.Ct. at 759. Here, UHPP is attempting to transform an ordinary tort—tortious interference with business—into a § 1985(3) conspiracy, and clearly *Bray* forbids that. *Cf. Trautz v. Weisman,* 819 F.Supp. 282, 291 (S.D.N.Y. 1993) ("definitional ploy" identified in *Bray* did not prevent disabled residents from relying upon § 1985(3) because the plaintiffs there defined their status in terms of their disability, as opposed to any particular activity in which they had engaged). Consequently, insofar as UHPP's prevention clause claim is premised upon a class-based animus defined in terms of interference and disruption of its business, the court must find that that animus cannot support such a claim.

### b. "Women Seeking Abortions and Other Family Planning Services"

■ Next, UHPP asserts that the class-based animus requirement has been met because it was "established" at the hearing that the defendants "direct their activities at women seeking abortions and *other family planning services.*" UHPP Letter at 2 (emphasis in original). The court disagrees. Unlike the first proposed class-based animus, this one clearly was alleged several times in the amended complaint. *See, e.g.,* Amended Complaint at 18, ¶ 99, and at 20, ¶ 112. Still, the court does not agree with UHPP that this particular definition of a class-based animus comports with *Bray.* First, even though the *Bray* Court left open the issue of whether an alleged class-based animus directed at women in general could qualify as a class under § 1985(3), the Court made clear that the animus requirement "demand[s], ..., at least a purpose that focuses upon women *by reason of their sex....*" *Bray,* —— U.S. at ——, 113 S.Ct., at 759. As incredible as it may seem, the majority in *Bray* then plainly stated that an animus defined in terms of women seeking abortions does *not* have as its purpose a focus upon women by reason of their gender. *Id.* at —— – ——, 113 S.Ct. at 759–60. Given that, an animus such as UHPP urges, defined in terms of women seeking not just abortions but "other family planning services" as well, most certainly would not, as *Bray* mandates, have a "purpose that focuses upon women *by reason of their sex*". *Id.* at ——, 113 S.Ct. at 759 (emphasis in original).

One pre-*Bray* decision, because of the remarkable factual similarity between it and the present case, provides an additional basis for the court's holding today that an animus directed at women seeking abortions and other family planning services does not rise to the level of a class-based animus for § 1985(3) purposes. The Fifth Circuit in *Mississippi Women's Medical Clinic v. McMillan,* 866 F.2d 788 (5th Cir.1989), held that where the plaintiff abortion clinic defined the object of the defendants' animus as "women of childbearing age who seek medical attention from the MWMC [clinic]," such class was "so under-inclusive as to mischaracterize the dispute." *Id.* at 794. In so holding, the Fifth Circuit pointed out that:

> the protestors do not target their pro-life advocacy at any particular group. The

---

**26.** UHPP Letter at 2.

protestors (who are made up of both men and women) confront and try to persuade to their point of view all groups—men, women of all ages, doctors, nurses, staff, the female security guards, etc..... [T]he animus of the protestors is to dissuade *anyone* who contributes to the incidence of abortions.

*Id.* (emphasis in original). The Court ended its discussion of animus by noting, "[t]hat the legislative history indicates that Congress wanted to evaluate 'class-based invidious discrimination' through the lens of 'animus or motivation,' *not* impact." *Id.* (citation omitted) (emphasis added). Significantly, the Fifth Circuit's emphasis on animus or motivation, as opposed to impact, is nearly identical to the view subsequently adopted by the Supreme Court in *Bray,* where the Court completely disavowed the notion that a class-based animus can be determined solely by effect. *See Bray,* —— U.S. at ——, 113 S.Ct., at 760.

UHPP has defined the object of the defendants' animus in much the same way as did the plaintiffs in *McMillan.* Another similarity between *McMillan* and the present case is, as will be discussed momentarily, the fact that many of the defendants here testified that they too protest to try and convert others (male and female) to their point of view. And, as in *McMillan,* and especially after *Bray,* this court is forced to conclude that a class of "women seeking abortions and other family planning services," is also "so under-inclusive as to mischaracterize the dispute." *See McMillan, supra* 866 F.2d at 794. As discussed in § I(A), although in a different context, the defendants' activities herein are motivated by a fervent belief that abortions are morally reprehensible. Furthermore, UHPP is focusing solely upon the impact or effect defendants' activities might have upon women and that is impermissible under the teachings of *Bray. See Bray,* —— U.S. at ——, 113 S.Ct. at 760. Thus, the second animus as specified by UHPP is also insufficient and cannot support a prevention clause claim.

### 3. Women in General

■ Lastly, UHPP appears to contend that defendants' activities are motivated by a discriminatory animus directed against women in general. This animus too cannot save UHPP's supposed prevention clause claim. Once again, there is no specific allegation in the amended complaint with respect to this claimed animus. For now the court will overlook that omission. Nevertheless, accepting as it must the Supreme Court's pronouncement that an animus defined in terms of women seeking abortions does not have as its purpose a focus upon women by reason of their gender, the court cannot overlook the fact that the present record does not support a finding that these defendants were motivated by a discriminatory animus against women in general. Or, as one Court has put it, the record does not establish that these defendants are acting "from an animus directed at women *qua* members of the female gender." *Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 628–29 (11th Cir. 1992).

Not one defendant testified that he or she was motivated by an animus directed against women generally, and in fact defendant Dennis Wolterding specifically testified to the contrary. Instead, the defendants convincingly testified, one after another, that they are motivated by their disapproval of abortions. They further testified that their conduct is aimed at preventing not only women from obtaining abortions, but it is also designed to prevent providers or anyone assisting in the providing of abortions from doing so. For example, Marjorie Dujack testified that the main reason she picketed was to change the hearts of the escorts, UHPP's Executive Director, and anyone else in the vicinity of UHPP's clinics, including pro-choice activists. Ms. Dujack further testified that her antiabortion activities have been specifically directed at one of the clinics male doctors, who performs abortions.[27] Likewise, Dennis Wolterding testified that as part of his training to be a "sidewalk counselor," he was trained to politely approach prospec-

---

27. On occasion Ms. Dujack has shouted and gotten angry with this particular doctor because his license plate reads "Ode to Joy," or words to that effect, and apparently she takes offense at that because he performs abortions.

tive UHPP patients and passers-by alike (both male and female) and to offer them antiabortion literature. In the court's opinion, all of this testimony, as well as other testimony not detailed herein, shows that these defendants, as were the *Lucero* defendants, were not motivated by a gender-based animus and certainly did not have as the purpose of their animus a focus "upon women *by reason of their sex*" as *Bray* dictates. *See Bray,* —— U.S. at ——, 113 S.Ct., at 759. The fact that, as UHPP noted, by injecting themselves into a woman's decisionmaking process, the conduct of these defendants seems paternalistic, does not change the court's view.

Before leaving the animus issue, the court must address UHPP's last effort to avoid *Bray's* harsh impact on this case. UHPP suggests that even after *Bray* because the Second Circuit in *Terry, supra,* recognized that women in general may be the focus of a § 1985(3) conspiracy,[28] its § 1985(3) cause of action can be maintained on the basis that the focus of defendants' animus here is women in general. In this court's view, however, after *Bray* the precedential value of *Terry* to a case such as this has been seriously undermined. While a gender-based animus may still satisfy the class-based animus component of a § 1985(3) claim, it seems that the practical effect of *Bray* is to foreclose this avenue of relief to abortion providers such as UHPP. Thus, based upon all of the foregoing, the court finds that UHPP has not shown a class-based invidiously, discriminatory animus, which is a necessary element of a § 1985(3) cause of action, even under the prevention clause.[29]

■ Because UHPP's § 1985(3) prevention clause claim must fail for lack of a proper class-based animus, "an element required for § 1985(3) claims against both private conspiracies and those under color of state law, any distinction between the standards for private conspiracies and conspiracies under color of state law is immaterial." *See Trautz,* 819 F.Supp. 282, 290 n. 5 (S.D.N.Y.1993); *see also Conrad v. Perales,* 818 F.Supp. 559 (W.D.N.Y.1993) (declining to find a state action exception to *Griffin's* animus requirement). The court notes in passing, however, that even if it were to adopt Justice Souter's position that a prevention clause claim may be maintained "even when the ultimate object of the conspiracy is to violate a constitutional guarantee that applies solely against state action[,]" from a substantive point of view, UHPP's prevention clause claim could not withstand the defendants' motion to dismiss. Justice Souter described the scope of his construction of the prevention clause as "limited[:]"

> It certainly would not forbid any conduct, unlike that at issue here, protected by the First Amendment. Nor would it reach even demonstrations that have only the incidental effect of overwhelming local police authorities, for the statute by its terms requires a "purpose" to "preven[t] or hinde[r] the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." Indeed, it would not necessarily reach even most types of civil disobedience that may be intended to overwhelm police by inviting multiple arrests, because the purpose of these is not ordinarily to discriminate against individuals on the basis of their exercise of an independently protected constitutional right.

*Bray,* —— U.S. at —— n. 10, 113 S.Ct., at 777 n. 10. So in the present case assuming, without deciding, that defendants' protests had the effect of "overwhelming" law enforcement officials on December 8, 1988 and

---

28. The Second Circuit in *Terry* soundly held, "[a]s conspiracies directed against women are inherently invidious, and repugnant to the notion of equality of rights for all citizens, they are therefore encompassed under the Act [§ 1985(3)]." *Id.* at 1359. The Second Circuit is not alone in this regard. *See Volunteer Medical Clinic, Inc. v. Operation Rescue,* 948 F.2d 218, 224 (6th Cir.1991) (and cases cited therein) ("The majority of circuit courts ... have agreed and, ..., have found gender discrimination actionable under § 1985(3).").

29. In light of this holding, the court need not consider the Kriss defendants' third argument that UHPP's purported prevention claim is not viable because there has been no showing of anything but, at most, an incidental impact on interstate travel.

March 24, 1989, such effect was only incidental. Moreover, UHPP's emphasis on the effects of defendants' actions, such as the denial of access to the Albany clinic for a short period of time on March 24, 1989, is misplaced in light of *Bray*. There, Justice Scalia pointedly stated that "the distinction between "purpose" and "effect" [is rendered] utterly meaningless if a *purpose* to prevent or hinder law enforcement officials can be found in evidence that the protestors outnumbered the officers and that 'the police were unable to prevent the closing of the clinic for more than six (6) hours.'" *Bray,* —— U.S. at ——, 113 S.Ct. at 767 (quoting *Bray I,* 726 F.Supp. at 1489, n. 4) (other citations omitted). Consequently, given the fact that this record does not support a finding that defendants' purpose was to prevent or hinder authorities from providing citizens with equal protection of the laws, even under Justice Souter's analysis, UHPP's prevention clause claim cannot be maintained.

For all of these reasons, defendants' motion to dismiss the § 1985(3) cause of action in its entirety is granted.

## II. Amendment of the Complaint

■ In response to the defendants' motion to dismiss, UHPP did not request to amend its complaint to bring it into conformity with *Bray*. However, because of the Second Circuit's narrow reading of *Bray* in *West Hartford,* the court will address that issue *sua sponte*. In *West Hartford* the Second Circuit plainly stated that "[w]e are of the view that the Court's analysis of the animus aspect of *Bray* is tied to the facts there adduced: ...." *West Hartford,* 991 F.2d at 1048. The Second Circuit therefore remanded that case to the district court for reconsideration of the animus element. On remand the Second Circuit also directed the district court to "scrutin[ize] ... the instant record through the prism of the *Bray* Court's pronouncement that 'impairment [of the right] must be a conscious objective of the enterprise.'" *Id.* (quoting *Bray,* —— U.S. at ——, 113 S.Ct., at 762). The Court also mentioned, citing *Carpenters, supra,* that "it would be well" for the district court to reconsider on remand "the state involvement aspect of the Center's claim of interference with the abortion right."

*Id.* at 1048 n. 11. In other words, the Second Circuit directed the district court to revisit the testimony it had heard previously at the preliminary injunction hearing in light of *Bray*.

Citing *West Hartford,* in another case involving antiabortion activists in the Buffalo area, Judge Arcara granted the defendants' motion to dismiss the plaintiffs' § 1985(3) cause of action, but granted plaintiffs leave to bring that cause of action within the holding of *Bray*. *Pro–Choice Network, supra* 828 F.Supp. at 1026–27. Similarly, the district court in *Lucero, supra,* allowed the plaintiffs ten days in which to "file an amendment to state whether they truly make allegations in this case distinguishable from the purported § 1985(3) claims in *Bray,* particularly as to 'class-based invidiously discriminatory animus and intent to deprive of a right guaranteed against private impairment.'" *Id.* at 5 (quoting *Bray*) (footnote omitted). Thus, at first glance it would seem that this court too should permit UHPP to amend its complaint with respect to the § 1985(3) cause of action.

Amendment of the complaint will not be allowed here however. There is a critical difference between the three cases just mentioned and the present case. In all three of those cases the courts were examining complaints which had been drafted, and records which had been developed, based upon the state of § 1985(3) jurisprudence prior to *Bray*. Those courts did not have the opportunity, which this court has had, to view the complaints and/or the proof against the backdrop of *Bray*. It is only fitting then that those plaintiffs were allowed to amend their complaint in an effort to satisfy *Bray*. In the present case, though, UHPP has already been given that opportunity, albeit not in the form of a formal amendment to its complaint. As mentioned earlier, as part of its post-*Bray* submissions, UHPP proffered three separate definitions of the class-based, invidiously discriminatory animus which it believes motivated these defendants; and which it also believes comport with *Bray*'s § 1985(3) pleading requirements. Unlike *Pro–Choice Network, Lucero,* and *West Hartford,* this court has, in light of *Bray,* thoroughly considered each of those definitions of a class-based

animus proposed by UHPP and has found them to be insufficient. Stated somewhat differently, because, for the most part, this court has already engaged in the analysis suggested by the Court in *West Hartford,* and because the court can conceive of no way for UHPP to satisfy *Bray* in terms of a class-based animus, there is no basis for allowing UHPP to amend its complaint. What is more, UHPP never requested leave to amend, which although not dispositive, is a factor which cannot be ignored.

### III. Pendent Jurisdiction

■ The court must now focus its attention on whether, in the absence of a federal claim, it should exercise pendent jurisdiction over the remaining eight state law claims. It is well-settled that "[a] district court may exercise pendent jurisdiction over state-law claims 'whenever the federal-law claims and state-law claims in the case "derive from a common nucleus of operative fact" and are "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." ' " *Block v. First Blood Associates,* 988 F.2d 344, 351 (2d Cir.1993) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988)) (quoting in turn *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). Whether to exercise pendent jurisdiction lies within the sound discretion of the district court. *Id.* (citation omitted); *see also Gibbs,* 383 U.S., at 726, 86 S.Ct., at 1139. "In exercising that discretion, a district court is required to 'consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction....' " *Id.* (quoting *Carnegie–Mellon,* 484 U.S., at 350, 108 S.Ct., at 619). Thus, "[t]he doctrine of pendent jurisdiction ... is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1054 (2d Cir.1990) (quoting *Carnegie–Mellon,* 484 U.S., at 350, 108 S.Ct., at 618). Although failure to dismiss a pendent claim after dismissing a federal claim " 'may be an abuse of the district court's discretion' especially when the state claim involves novel question of state law, ... the dismissal of pendent claims is *not* always required when federal claims in an action are dismissed." *Id.* (quoting *Robison v. Via,* 821 F.2d 913, 925 (2d Cir.1987)) (citation omitted) (emphasis added).

One court adjudicating a case similar to the present one, when faced with the issue of whether to exercise pendent jurisdiction after the dismissal of a § 1985(3) claim, held that the exercise of such jurisdiction was proper. *Pro–Choice Network, supra,* 828 F.Supp. at 1026–27. Based on a careful and thoughtful evaluation of each of the relevant factors enumerated above, Judge Arcara opined that even without the § 1985(3) claim, "the Court would be compelled" to exercise pendent jurisdiction over the remaining state law claims in that case. *Id.* at 1027. A review of those factors in the present case yields the same result.

■ Before addressing each of the relevant factors, the court points out that it disagrees with the Washburn defendants' assertion that federal courts are not the proper forum for cases such as this and that dismissal of the pendent claims is mandated under both *Bray* and *Beam. See* Washburn Defendants' Post–*Bray* Memorandum of Law at 4 and 6. In making this argument, the Washburn defendants are conveniently ignoring the doctrine of pendent jurisdiction. In this court's view nothing in *Bray,* or, for that matter, in *Beam* dilutes the power of a district court to decide whether or not to retain jurisdiction over pendent state claims. Furthermore, the argument by the Washburn defendants that after January 13, 1993—the date *Bray* was decided—cases such as the present are insubstantial and/or frivolous, even if brought prior to that date, is, in the words of Judge Arcara, "a contortion of the plain meaning of the [*Bray* ] Court's holding." *Pro–Choice Network,* 828 F.Supp. at 1021. Finally, as detailed below, here the traditional factors of judicial economy, convenience, fairness and comity lead the court to the inescapable conclusion that it should retain jurisdiction over the pendent claims herein.

Because neither the Kriss defendants[30] nor UHPP[31] challenge the court's authority to exercise jurisdiction over the pendent claims, only a relatively brief discussion of the factors pertinent to a determination of whether to exercise pendent jurisdiction in this case is necessary. Just as in *Pro–Choice Network*, "this is not the 'usual' case[,]" where the elimination of the federal claim prior to trial weighs heavily in favor of the court declining to exercise jurisdiction over the remaining pendent state claims. *See* 828 F.Supp. at 1028. Substantial resources have been expended during the time in which this case has been pending before this court. Over the past three years the court has entertained at least one Order to Show Cause by UHPP seeking a temporary restraining order and an extensive defense motion to dismiss, which resulted in a lengthy memorandum-decision and order by this court. Additionally, the court and the parties have spent a significant amount of time attempting to resolve this matter without further litigation. The culmination of those efforts was a provisional consent decree entered into by some but not all of the defendants.[32] That decree set forth detailed parameters for the protests by these defendants at UHPP's clinics. Unfortunately, the defendants who originally agreed to the terms of that decree exercised their prerogative thereunder to file a notice to vacate, and the decree was vacated.[33] The court then proceeded to conduct a four day evidentiary hearing to determine whether there is any basis for granting UHPP injunctive relief and that is the issue presently before the court.

Just reciting the procedural history of this case does not, however, fully reflect the nature and extent of the court's involvement in this litigation. Due to the parties' passionate beliefs on the abortion issue—both pro and con—this litigation has been marked by an unusual degree of animosity, which has resulted in court intervention, both formal and informal, at nearly every step of the way. Thus, while the court's involvement admittedly has not been as extensive as was the case in *Pro–Choice Network*,[34] it has been substantial. Therefore the fact that this action has not yet reached the trial stage, and that the federal claim has been dismissed prior to that time, does not automatically require dismissal of the pendent state claims. *See Enercomp, Inc. v. McCorhill Pub., Inc.,* 873 F.2d 536, 545 (2d Cir.1989) (quoting *Graf*

**30.** In their memorandum of law, the Kriss defendants engage in a fairly comprehensive analysis of each of the eight remaining pendent state law claims; and, they never outright ask the court to relinquish its jurisdiction over those claims. Therefore, presumably they favor the court's exercise of jurisdiction over the pendent claims. In fact, the court recalls that at the March, 1993 status conference Mr. Kriss suggested that if the court eventually agreed with the defendants that UHPP's § 1985(3) cause of action could not be maintained after *Bray*, the court should, nevertheless, retain jurisdiction over the pendent claims. And all of this is consistent with the Kriss defendants' statement that they have no objection to the court retaining jurisdiction over the pendent claims for monetary as opposed to equitable relief. Kriss Defendants' Memorandum of Law at 22.

**31.** *See* Plaintiff's Memorandum of Law at 16–17 (arguing for the court's retention of jurisdiction over the pendent claims for reasons of judicial economy).

**32.** *See* Docket Entry # 45.

**33.** In reviewing the file, the court notes a couple of procedural matters in connection with the provisional consent decree. The first is that two of the defendants named therein, Heather Birnbaum and Gary Winn, never filed a notice to vacate the decree as against them. Perhaps that is because, apparently, as the court was advised at the commencement of the preliminary injunction hearing, those two defendants reached some kind of separate settlement agreement with UHPP. In any event, no order was ever submitted to the court in connection with defendants Birnbaum and Winn, as counsel indicated at the hearing would be done. Counsel are directed to immediately submit such an order so that the court's docket accurately reflects the remaining defendants in this action.

The other procedural matter is that Jefferson Daniels' name appears as a defendant agreeing to the terms of the provisional consent decree, but he did not join in the Notice to Vacate. Therefore, technically (and ignoring for the moment the possible effect of *Bray* upon that decree), he is still bound by the terms of that decree. The court strongly urges counsel for defendant Daniels and for UHPP to somehow resolve this procedural irregularity.

**34.** 828 F.Supp. at 1028–30.

*v. Elgin, Joliet and Eastern Ry. Co.,* 790 F.2d 1341, 1348 (7th Cir.1986)) ("'Trial is simply a convenient benchmark marking the a point by which substantial resources have surely been committed. If those resources are expended without a trial, the essential purpose of the doctrine of pendent jurisdiction may be served by retaining the case.'")

Further, even though the Second Circuit has held that "judicial economy is not dispositive[,]" *DiLaura v. Power Authority of State of NY,* 982 F.2d 73, 80 (2d Cir.1992) (citation omitted), as the foregoing makes clear, this court is all too familiar with the facts and circumstances of this case. It would be difficult to think of a greater waste of judicial resources (not to mention the parties' resources) than to require a state court to start anew familiarizing itself with this case. *See Enercomp,* 873 F.2d at 546. Two other factors also weigh in favor of the court continuing to exercise jurisdiction in this case and that is the fact that it does not appear at this juncture that there are any novel and unsettled issues of state law which might justify dismissal of the pendent claims. *See Raucci, supra* 902 F.2d at 1054. Also, certainly none of the parties hereto are inconvenienced by the court exercising pendent jurisdiction over these state claims. In fact, inconvenience would result if the court refused to do that. Last, although the court is not prepared to go this far, it is interesting to note that at least one court has speculated that where the parties had engaged in an enormous amount of effort in litigating their case in federal court, "[i]t would border on a violation of the Eighth Amendment if the parties had to start over in another forum." *Haroco, Inc. v. American Nat. Bank and Trust Co.,* 814 F.Supp. 655, 656 (N.D.Ill.1992). In light of the foregoing, even though the court has found that UHPP's federal cause of action must be dismissed, this is a proper case for the exercise of the court's pendent jurisdiction over the eight remaining state law claims. Consequently, at long last, the court will now move on to consider UHPP's application for a preliminary injunction vis-a-vis its state law claims.

## IV. PRELIMINARY INJUNCTION

### A. Standard

The all too familiar standard for the granting of injunctive relief was again recently set forth by the Second Circuit:

> A party is entitled to a preliminary injunction *only* if it establishes: '(1) irreparable harm *and* (2) either (a) a likelihood of success on the merits, *or* (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, *plus* a balance of the hardships tipping decidedly in favor of the moving party.'

*ICN Pharmaceuticals, Inc. v. Viratek, Inc.,* 2 F.3d 484, 490 (2d Cir.1993) (quoting *Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)) (emphasis added). For purposes of applying this standard, the Second Circuit has distinguished between mandatory and prohibitory injunctions. The former is defined as an injunction which "will give the movant essentially all the relief he [or she] seeks." *Johnson v. Kay,* 860 F.2d 529, 540 (2d Cir.1988) (citing *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025–26 (2d Cir. 1985)). "[M]andatory injunctions ... disturb the status quo by ordering affirmative relief, ...." *Id.* at 541 (citation omitted). Prohibitory injunctions, on the other hand, preserve the status quo. *Id.*[35] The distinction between mandatory and prohibitory injunctions cannot be made, however, "simply by reference to whether or not the *status quo* is to be maintained or upset." *Abdul Wali,* 754 F.2d at 1025. The Second Circuit has differentiated between "these equitable cousins ... by examining whether the non-moving party is being ordered to perform an act, or refrain from performing." *Id.* The distinction between a mandatory and a prohibitory injunction is important because where the former is sought, "[a] somewhat higher standard is applied, under which the movant must show a *substantial* likelihood of success on the merits, rather than merely a likeli-

---

**35.** *See also Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1326, 1346 (2d Cir.1992) (quoting *Abdul Wali, supra,* 754 F.2d at 1025) (citations omitted) ("'Normally, the purpose of a preliminary injunction is to maintain the *status quo ante* pending a full hearing on the merits.'").

hood of success." *Id.* at 540 (emphasis in original) (citation omitted).

### 1. Mandatory v. Prohibitory

 The first issue therefore, and one which none of the parties addressed, is whether the injunction sought by UHPP is mandatory or prohibitory in nature. A perusal of the injunctive relief sought by UHPP shows that if a preliminary injunction were granted, such relief, on a continuum, falls closer to being prohibitory in nature than it does to being mandatory. To be sure, the requested injunctive relief here may be considered mandatory in that if it were granted, then, arguably, the status quo would be disrupted because the defendants would not be able to conduct their antiabortion demonstrations in the same manner as before. By the same token, granting of a preliminary injunction in the form sought by UHPP would essentially order defendants to refrain from engaging in certain activities, thus rendering that injunction prohibitory in nature. Moreover, the granting of a preliminary injunction in this case would not grant UHPP all of the relief to which it would be entitled if it ultimately prevails on the merits. In addition to seeking a preliminary injunction, UHPP is also seeking a permanent injunction, declaratory relief, both compensatory and punitive damages and attorney's fees. Therefore, the court deems the preliminary injunction sought by UHPP to be prohibitory—*not* mandatory; and as such, UHPP will not be held to the more stringent standard applicable when a mandatory injunction is sought.

### B. Irreparable Harm

Having decided the governing standard, the next issue is whether UHPP has made the requisite showing (applicable under either standard) of irreparable harm. The Second Circuit in *Borey v. National Union Fire Ins. Co.*, 934 F.2d 30 (2d Cir.1991), again reminded lower courts that:

> "perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is *likely* to suffer irreparable harm before a decision on the merits can be rendered." . . .

*Id.* at 34 (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983) (quoting in turn 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 431 (1973) (footnote omitted)) (emphasis added). "Thus, a *mere possibility* of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Id.* (emphasis added). In that regard, it is important to note that irreparable harm " 'cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again, . . . .' " *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir.1992) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983)). The Second Circuit has consistently held that " '[r]eal and imminent, not remote, irreparable harm is what must be demonstrated.' " *Id.* (quoting *Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir.1980) (per curiam)).

 In assessing whether the movant has shown the requisite irreparable harm, a court may not "rest a finding of irreparable harm solely on the past conduct of the parties." *Talk To Me Products, Inc. v. Lanard Toys, Inc.*, 24 U.S.P.Q.2d 1798, 1992 WL 266930 at *2, 1992 U.S.Dist. LEXIS 14746 at *6 (E.D.N.Y. Sept. 25, 1992). However, "[p]ast injury may have a bearing upon whether an injunction should be granted, but only as to the likelihood that the past misconduct will be repeated." *Socialist Workers Party v. Attorney General of U.S.*, 642 F.Supp. 1357, 1425 (S.D.N.Y.1986); *see also Talk to Me Products, supra*, (court "must look to the totality of the circumstances to determine whether a party's past actions suggest in the present context a strong possibility of irreparable harm") (citation omitted). Thus, "[t]o obtain injunctive relief based on past injury the plaintiff must show a real and immediate threat that the injury will be continued or repeated." *Socialist Workers*, 642 F.Supp. at 1425) (citing *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). Further, even though a defendant's conduct "may have been reprehensible, inequitable conduct alone cannot justify the entry of a preliminary injunction." *Buckingham*

*Corp. v. Karp,* 762 F.2d 257, 262 (2d Cir. 1985) "The linchpin of such interim relief is that threatened irreparable harm will be prevented by that injunction." *Id.* (citation omitted). Thus, *a fortiori,* if a movant cannot show irreparable harm, the other requirements need not be considered. *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). And, obviously, in the absence of a showing of irreparable harm, the moving party is not entitled to injunctive relief. *See Levin,* 966 F.2d at 90; *see also Lanvin Inc. v. Colonia, Inc.,* 739 F.Supp. 182, 192 (S.D.N.Y.1990) (emphasis added) (citation omitted) "Failure to show irreparable harm is sufficient grounds for denying preliminary relief *even if* the other requirements of the preliminary injunction standard are met."

In determining exactly what constitutes irreparable, the Second Circuit has held that "[m]onetary loss alone will generally not amount to irreparable harm." *Borey,* 934 F.2d at 34. The Court further explained:

'A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation.' . . . Such evidence might include, for example, proof that the monetary loss will probably force the party into bankruptcy. . . . In such a situation, there is more than the risk of mere monetary loss. But, when a party can be fully compensated for financial loss by a money judgment, there is simply no compelling reason why the extraordinary remedy of a preliminary injunction should be granted. . . .

*Id.* (citations omitted). Similarly, " '[m]ere injuries, however substantial, in terms of money, time and energy . . . are not enough' to justify injunctive relief.' " *Stewart v. United States I.N.S.,* 762 F.2d 193, 199 (2d Cir.1985) (quoting *Oburn v. Shapp,* 521 F.2d 142, 151 (3rd Cir.1975), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977)) (other citation omitted). It is with these guiding principles in mind that the court has examined the record in the present case for proof of irreparable harm.

To support a finding of irreparable harm, prior to *Bray,* in the abortion setting, courts, including this one, relied upon the rule that generally "a deprivation of constitutional rights which cannot be repaired by an award of damages, constitutes irreparable injury." *Cousins v. Terry, supra,* 721 F.Supp. at 429 (citations omitted); *see also Terry, supra* 886 F.2d at 1362; *Pro–Choice Network, supra* 799 F.Supp. at 1428. For example, in *Pro–Choice,* Judge Arcara relied upon, *inter alia,* "[p]laintiffs claims that defendants' "rescue" activities violated the constitutional rights of women to travel and to choose to have an abortion." 799 F.Supp. at 1428. Although *Bray* unquestionably changed the complexion of this lawsuit, as well as other similar pending actions, it did not change the fact that under the Fourteenth Amendment's right to privacy, women still have a right to obtain an abortion within the parameters delineated by the Supreme Court in the now legend case of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Furthermore, at least in some settings, there is still recognized a constitutionally protected right to travel interstate, which is protected against private interference. *See Bray,* —— U.S. at ——, 113 S.Ct., at 762 (citing *Griffin, supra* 403 U.S., at 105–06, 91 S.Ct., at 1799–1800). Thus, even if *Bray* precludes § 1985(3) liability from being premised upon a deprivation of the right to an abortion or the right to travel interstate, it does not necessarily follow that a deprivation of such rights cannot amount to a showing of irreparable harm.

■ Be that as it may, after carefully combing the record in the present case, the court is simply unable to find that UHPP has carried its burden of proof on this critical element. UHPP's Executive Director, Ms. Klepper, provided the bulk of the testimony as to how, in her opinion, the defendants' activities effected UHPP, its patients and its ability to provide medical services. She testified, for example, that many patients suffer from "significant emotional distress" when making the decision as to whether or not to proceed with an abortion; and that defendants' protests increased this distress. Ms. Klepper further testified that from a medical standpoint the patients' best interests were not being served because of the enhanced emotional distress attributable to defendants' protests. While the court has no reason to

doubt these statements, it is compelled to point out that there was no proof that any patient was delayed, even by one day, in obtaining an abortion; or that this distress created additional medical risks to any UHPP patient seeking an abortion. The only times when UHPP clinics were closed as a direct consequence of defendants' activities were December 8, 1988 and March 24, 1989; and then only for a period of approximately six hours on each day.[36] Ms. Klepper did testify that under a normal schedule 15–18 patients would have been scheduled to have been seen then, although she did not distinguish between those seeking abortions and those seeking other medical services. There was no evidence before the court, of any kind, that any patient who wanted to obtain an abortion on those days was prevented from doing so. No business records were offered, for example, showing that any potential abortion patient cancelled on the two days when UHPP was the target of a full scale rescue.

UHPP contends that under *Terry* it had no obligation to have a patient testify who had been denied access to one of its clinics. UHPP is disregarding the fact, however, that the discussion at that point in *Terry* centered on whether the health care providers had standing. *See Terry, supra* 886 F.2d at 1346–48. In addition, the record in *Terry* did contain uncontradicted evidence that a woman seeking a first trimester abortion was denied access by the defendants, and later had to undergo a medically more serious second trimester abortion. *Id.* at 1348. Given the high threshold which a party seeking injunctive relief must surpass in order to demonstrate irreparable harm, the court does not read *Terry* as holding that in a case such as this irreparable harm can be shown where there is no proof of a real and imminent threat to either UHPP's rights or those of its patients.

There was further testimony, also by Ms. Klepper that, understandably she was concerned that if potential patients wanted any kind of medical services from UHPP, they were being dissuaded from coming to UHPP because of defendants' picketing activities. Ms. Klepper's concern was, as it turns out, justified because over the years both staff and escorts[37] brought to her attention the fact that people did not want to enter UHPP's facilities because of the demonstrations. Patients would specifically request, over the phone, that they did not want appointments on certain days (i.e. Saturdays at Albany and Wednesdays at Hudson) when they knew protestors would be there. But again, there was no direct evidence that any potential patient was prevented from gaining access to UHPP's clinic by the defendants. Even taking into account the two rescues, given the lack of proof that any women were scheduled to receive abortions on those days, the court would have to speculate to find that defendants deprived UHPP patients of their constitutional rights.

During her testimony, several times, Ms. Klepper described defendants' activities as intimidating or harassing prospective patients. On cross-examination, when asked to explain what she meant by the use of those terms, Ms. Klepper clarified that at times defendants "harassed" people approaching the clinics by shouting, waving "grotesque" signs in their faces, and forcing antiabortion literature upon them. According to Ms. Klepper, depending upon the individuals, some were intimidated by these tactics because of the generally hostile environment which defendants created, whereas others were upset because they were personally confronted by defendants.

In the court's view, however, all of these facts, even in combination, do not suffice to establish irreparable harm, such as would

36. The only other proof regarding an UHPP clinic being closed had to do with a warning UHPP received that its Albany clinic might be targeted for a rescue on April 29, 1989, but there was no evidence that that ever occurred or that these defendant had any involvement with that tip.

37. As have many Planned Parenthood organizations across the country, UHPP implemented an escort service staffed primarily by volunteers to, in essence, provide moral support to people visiting its clinics while antiabortion activists are also present there. In addition to providing physical assistance to those wanting to enter the clinics, these escorts provide a counterbalance to the views being expressed by antiabortion activists who engage in "sidewalk counseling."

warrant granting injunctive relief at this point. UHPP asserts that delayed access to its facilities suffices to establish the necessary irreparable harm. In taking that position, UHPP relies upon the Second Circuit's decision in *Terry, supra.* The facts of *Terry,* however, stand in sharp contrast to the facts now before the court on this record. One critical distinction between *Terry* and this action is that in *Terry* the defendants' expressly stated that they intended to continue engaging in blockades—even if doing so would violate court orders. *Id.* Further, unlike *Terry,* where the defendant protestors were blockading on an ongoing basis, these defendants engaged, if at all, in only two blockades or rescues at UHPP's clinics—one on December 8, 1988 and a second on March 24, 1989. Not one of these defendants has engaged in blockading and/or rescuing at any of UHPP's clinics since 1989—*over four years ago.* Indeed, several defendants testified that they ceased engaging in that kind of protest activity out of concern for their families; that is they have children and do not want to risk imprisonment, or that they are simply too busy with their families to devote the time and effort to these types of activities which they formerly had.

The significance of the time frame here cannot be overstated in light of the requirement that the threat of irreparable harm be "real and imminent." Conspicuously absent from the present record is a showing that any of these defendants intend to participate in rescue and/or blockading at any of UHPP's facilities in the future. In fact, none of the defendants have done so since the commencement of this lawsuit—more than three years ago. In addition, when specifically questioned, the defendants uniformly testified that they had no plans to engage in rescues at UHPP's clinics. At least some of the defendants went one step further by also testifying that they do not, in the future, plan to participate in rescues at any clinics which offer abortions in the Capitol District. In further response to direct questioning, some defendants even testified that they were not aware of any organization or group which was planning a rescue at either UHPP's clin-

ics or any similar clinic in the Capitol District. Thus, the court is persuaded, based upon both the defendants' testimony and their conduct to date, that there is, at most, only a remote possibility of irreparable harm. The drastic remedy of injunctive relief cannot be premised upon such a weak showing of irreparable harm.

The court is well aware that prior to *Bray* several courts granted preliminary injunctions in cases of this kind.[38] Whether irreparable harm has been shown in a given case usually requires a fact intensive inquiry; and when the facts of this case are juxtaposed against those in other similar cases, the differences are striking. Both *Cousins* and *Bray I,* for example, involved situations where protestors were participating in ongoing rescue activities. In *Bray I,* the court noted that the rescues had occurred on almost a weekly basis for a period spanning five years. *See* 726 F.Supp. at 1489. Likewise, in *Cousins* this court found that on "many occasions" the defendants blocked the entrance to plaintiffs' medical facilities. *Cousins,* 721 F.Supp. at 430. This court then went on to recount in some detail defendants' rescue activities over the course of three and a half years, which included sabotaging the locks, defendants chaining themselves to each other and then to a large cement block inside plaintiffs' facilities; and, at one point, just two months prior to the preliminary injunction hearing, entrance ways were blocked by rotating groups of approximately 200 sit-in demonstrators. *Id.* at 431. Moreover, the defendants in *Cousins* had the tenacity to blockade plaintiffs' facilities two days after the expiration of the court's temporary restraining order.

Similar activities were recited by Judge Kelly in *Women's Health Care Services, supra.* Clinics in the Wichita area were particularly hard hit because as Judge Kelly recognized, Operation Rescue came in with national participants and "teams" of protestors. 773 F.Supp. at 262. Those defendants did not limit themselves to passively blockading clinic entrances. They intentionally blocked public streets, as well as private driveways.

---

**38.** *See infra* n. 10.

Additionally, their activities frustrated or delayed effective police action.

Besides the differences in terms of the tactics employed and the frequency thereof, in cases where irreparable harm has been found and injunctive relief granted, there was evidence that patients were regularly being deprived of access to the clinics, and hence, being deprived of the right to choose an abortion. Evidence was also presented in those cases of the medical risks inherent in a delayed abortion. See, e.g., Holy Angels Catholic Church, supra, 765 F.Supp. at 620; and Terry, 886 F.2d at 1362. Evidence of this type is not before the court today. Also, it is noteworthy that several courts found that there was a substantial likelihood that defendant demonstrators would engage in rescue activities in the future. See, e.g., Bray I, 726 F.Supp. at 1490; and Terry, 886 F.2d at 1362. Obviously there is also no evidence of this kind in the present record. In short, the defendants' conduct in this case, particularly after the March 24, 1989, rescue falls far short of the types of activities which courts have enjoined in other similar litigation.

The facts just outlined are, noticeably, far more egregious than any proven at the preliminary injunction hearing in this case. Admittedly, this record does show that many of UHPP's patients and staff, including escorts, felt intimidated and/or harassed by defendants' conduct, and that was not limited to the two days when rescues took place. Even the district court in Bray I, however, refused to enjoin "those "rescue" activities that tend to intimidate, harass or disturb patients or potential patients of the clinics." 726 F.Supp. at 1497. On First Amendment grounds, the court found that request to be "overbroad." Id. "Defendants' First Amendment right to express their view cannot be curtailed or limited because some persons are timid or reluctant to hear expressions of defendants' views on the issue of abortion." Id. And, on appeal, the Fourth Circuit expressly affirmed that aspect of the district court's holding. Bray II, 914 F.2d at 586.

A similar view was expressed by the Fifth Circuit in McMillan, supra, when it affirmed the district court's refusal to grant injunctive relief therein. Observing that that case "present[ed] a conflict between the First Amendment rights of the protestors to advocate a right-to-life position and the privacy interests of women who seek to have abortions performed at the clinic, while being insulated from the protestors advocacy[,]" the Circuit Court agreed that " 'granting the injunction would be substantially more likely to infringe on first amendment rights than denying the injunction would be to result in a denial of privacy rights.' " 866 F.2d at 795. The Court offered the following justification for its affirmance: "The Supreme Court's First Amendment jurisprudence tilts the scale assessing threatened harm decisively in favor of the protestors. Loss of First Amendment freedoms is considered an irreparable injury." Id. The Court then commented that, "[n]either we nor the clinic can cut off the peaceful communication of information, distasteful to some though it may be." Id. at 796.

Undisputably UHPP has been operating under adverse and at times hostile circumstances as it has tried to continue to carry out its mission of providing to women medical services of all types. But, this is a case of competing interests—the constitutionally protected rights of the defendant protestors to free speech and assembly and the potential patients' constitutional right to privacy, which encompasses the right to choose an abortion, at least in the first trimester. When all is said and done, however, UHPP, as the party moving for injunctive relief, has not met its burden of establishing irreparable harm—an essential prerequisite to the granting of such relief. Therefore, because the evidence before the court does not establish the requisite irreparable harm which injunctive relief could forestall, UHPP's application for the same is hereby denied.

## V. Attorney's Fees

The final part of the court's decision herein pertains to the post-hearing motions for attorney's fees by the Kriss defendants and by pro se litigant and attorney Brignola. They are seeking attorney's fees under 42 U.S.C. § 1988, costs pursuant to 28 U.S.C. § 1961

and sanctions under Fed.R.Civ.P. 11 against UHPP for costs incurred in defending this application for a preliminary injunction. The court will address these requests in reverse order.

■■■■ There is absolutely no basis for sanctioning UHPP, and thus that motion is denied. The next motion for "costs" pursuant to 28 U.S.C. § 1961 is, on its face, perplexing because that statute pertains to interest to be allowed on money judgments in civil cases. *See* 28 U.S.C. § 1961 (West Supp.1993). Consequently, because the court fails to see the applicability of that statute at this juncture, and because the moving parties have failed to adequately explain their reliance thereon, this motion must also be denied.

■■■■ Third, the court also finds utterly no basis for awarding these defendants attorney's fees under section 1988. Under the facts and circumstances presented, there is no need to engage in a comprehensive analysis of this statute (which incidentally has generated considerable litigation in its own right) and the case law construing it. Suffice it to say that section 1988 is a discretionary statute,[39] and the court declines to grant attorney's fees thereunder to the moving defendants. What is more, "[w]hen the prevailing party [under section 1988] is the defendant, that language has been construed to require the defendant to show that the action was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." " *Davidson v. Keenan,* 740 F.2d 129, 132 (2d Cir.1984) (quoting *Huges v. Rowe,* 449 U.S. 5, 14–15, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980)) (quoting in turn *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)) (other citations omitted). No such showing has been made in this case. Furthermore, insofar as attorney Brignola's request is concerned, the Supreme Court has unequivocally held that a *pro se* litigant is *not* entitled to a fee award under section 1988 whether or not the litigant is a lawyer.

*Kay v. Ehrler, supra,* 499 U.S. at 435–438, 111 S.Ct. at 1437–38. This holding provides an additional and even more compelling basis for denying his motion for § 1988 attorney's fees. Thus, all attorney's fees motions are hereby denied.

At this point, the court has a few observations. First of all, nothing in the court's decision today should be construed as condoning any sort of trespassing on UHPP's property or tortious harassment of UHPP's staff and/or patients. Nor does the court condone what appears to have been a few isolated incidents by a few of the defendants of "charging" oncoming vehicles. Such behavior endangers the physical safety of not only the driver, but the person charging the vehicle. Secondly, the court notes that the continually moving oval picket engaged in by some of the defendants, allowing patients to enter and exit UHPP's facilities is acceptable, so long as no one's physical safety is compromised. By the same token, UHPP escorts obviously can and should continue to assist patients into the clinics when necessary. Third, UHPP should be aware that even if the court today had reached the merits of the pendent state claims, at best, the present record seems to support, perhaps, the finding of only a few isolated incidents of trespass and/or tortious harassment. But again, there was no proof of a connection between those incidents and any UHPP patient being denied access to the clinics. Furthermore, insofar as UHPP is seeking monetary recovery, such as for the cost of implementing and providing an escort service, clearly that cannot form the basis for irreparable harm because eventually UHPP can be compensated monetarily; and so UHPP will have to wait for another day to attempt to recoup its alleged monetary losses.

Lastly, the court regrets that the parties to this dispute have been unable to arrive at some type of agreement whereby they can peacefully co-exist. To that end, the court strongly suggests that all counsel and *pro se* litigants meet, once again, in an effort to

---

**39.** That statute provides, in relevant part:
[t]he court, in its discretion, *may allow* the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988(b) (West Supp.1993) (emphasis added).

reach some kind of mutually acceptable agreement which would govern the parameters of defendants' activities at UHPP's clinics. The court is cognizant of the fact that the ideological schism between the parties on the abortion issue is vast. Nevertheless, instead of continuing with needless and expensive litigation, clearly the interests of all parties would best be served by opening the lines of communication and resolving this matter sooner rather than later.

Accordingly, defendants' motion to dismiss the seventh cause of action alleged in the amended complaint of Upper Hudson Planned Parenthood's is GRANTED. Upper Hudson Planned Parenthood's application for preliminary injunction pursuant to Fed. R.Civ.P. 65 is DENIED. The motions for attorneys' fees, "costs" and sanctions are in all respects DENIED.

IT IS SO ORDERED.